John E. HARMS, Jr.

v.

FEDERAL HOUSING ADMINIS-
TRATION

and

C. H. Borcherding, Jr., individually.

Civ. A. No. 16868.

United States District Court
D. Maryland.

June 14, 1966.

Robert L. Sullivan, Jr., and Leslie M. Pittler, Sullivan & Pittler, Baltimore, Md., for plaintiff.

Thomas J. Kenney, U. S. Atty., and Fred K. Grant, Asst. U. S. Atty., for District of Maryland at Baltimore, for defendants.

WATKINS, District Judge.

Plaintiff (hereinafter Harms) having been the subject of an Unsatisfactory Risk Determination by the State Director of the Federal Housing Administration for the State of Maryland [1] (hereinafter Maryland Director) under 24 C.F.R. 200.200, brought this suit against the Federal Housing Administration, and the Maryland Director personally. Preliminary and permanent injunctions, at least partially mandatory in nature, were sought against F.H.A. in the first count; and a second count sought money damages in the amount of $66,278.00 against the Maryland Director personally, for alleged libel.

The Answer on behalf of the defendants admitted many of the factual allegations of the complaint, but denied that plaintiff was entitled to any of the relief sought; and as affirmative defenses alleged that the complaint failed to state a claim upon which relief can be granted; that the court lacked jurisdiction over the subject matter of the action; and as to the second count, that the Maryland director was acting in his official capacity and was therefore immune from personal liability.

After hearing, the application for a preliminary injunction was denied, and thereafter the case was heard on the merits, was argued, and briefs were filed. Efforts at compromise having failed, the case has been submitted for decision.

---

1. By Public Law 89–174, 79 Statute 667, 5 U.S.C. § 624, the Federal Housing Administration was made a part of the Department of Housing and Urban Development, and the functions, powers and duties formerly vested in the Federal Housing Administration, and the functions, powers and duties vested in the Federal Housing Commissioner are now vested in the Secretary of that Department. Appropriate delegations permit the Federal Housing Commissioner, as an Assistant Secretary of the Department to continue as operations head of the Federal Housing Administration.

■ The second count, for libel, was not argued or briefed by Harms. Diversity of citizenship is not alleged, and the testimony clearly showed that diversity does not exist. The court is without jurisdiction, and it therefore is not necessary to consider whether or not, if jurisdiction did exist, the statements of the Maryland Director are absolutely privileged. See Barr v. Matteo, 1959, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434; Howard v. Lyons, 1959, 360 U.S. 593, 79 S.Ct. 1351, 3 L.Ed.2d 1454; Gregoire v. Biddle et al., 2 Cir. 1949, 177 F.2d 579.

The second count is dismissed.

■ Jurisdiction under Count I is asserted by Harms upon each and all of the following grounds:

1. Federal question plus amount in controversy, 28 U.S.C. § 1331.

(a) The complaint states no facts sufficient to state a cause of action "arising under the Constitution, Laws or treaties of the United States."

(b) No monetary damages are stated, and no monetary judgment is sought.

The first alleged ground of jurisdiction is clearly untenable.

■ 2. Diversity jurisdiction and amount in controversy, 28 U.S.C. §§ 1332(a) and (d).[2]

(a) No monetary damages are stated, and no monetary judgment is sought.

(b) Even if there were diversity jurisdiction, while the court could probably give a declaratory judgment under 28 U.S.C. § 2201 as to the proper interpretation of the regulations here involved, it is doubtful if this would justify the injunctive or mandatory relief herein sought (and to be discussed later).

This ground of jurisdiction is likewise untenable.

3. Mandamus, 28 U.S.C. § 1361.

■ This section confers original jurisdiction in the district courts of an action in the nature of mandamus to compel an officer or agency of the United States to perform a duty owed to a plaintiff. This section contemplates action affirmative in nature, rather than injunctive relief to prohibit improper action or conduct. The parties are in agreement that this section cannot be used where an officer or agency has made a discretionary decision while acting within the scope of his or its delegated authority. The defendants herein concede, however, that relief would lie against an officer or agency of the Government where action taken goes beyond statutory authority.

■ Should it be found that the Maryland Director made a decision he was not authorized to make under his delegated authority and therefore that he acted arbitrarily and capriciously, jurisdiction would exist.

Alternatively, and preferably, jurisdiction, if it exists, would result from the following:

■ (a) 12 U.S.C. § 1702, which is a waiver of sovereign immunity by the F.H.A., and which permits suit to be brought by it in the name of the Commissioner, or against it in the name of the Commissioner. This section does not give jurisdiction but merely waives sovereign immunity as a defense to a suit against the Commissioner. See Larson v. Domestic and Foreign Commerce Corporation, 1949, 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628; Dugan v. Rank, 1963, 372 U.S. 609, 83 S.Ct. 999, 10 L.Ed.2d 15.

■ The complaint should be amended to name as defendant the Housing Commissioner, who is now exercising his delegated authority as an Assistant Secretary of the Department of Housing and Urban Development.[3]

---

2. Harms incorrectly refers to 28 U.S.C. § 1332(b).

3. Although 12 U.S.C. § 1702 provides for suit against the Housing Commissioner,

no distinction has been made between the Commissioner as defendant and the F.H.A. as defendant. James River Apartments v. F.H.A., D.Md.1955, 136 F.Supp.

(b) Venue in this District is conceded under 28 U.S.C. § 1391(e), providing that suit may be brought against any "officer or employee of the United States or any agency thereof acting in his official capacity or under color of legal authority * * * [where] the cause of action arose, or * * * the plaintiff resides if no real property is involved in the action," if there is jurisdiction.

(c) The actual basis for jurisdiction would then be under the Administrative Procedure Act, 5 U.S.C. § 1009. Plaintiff in effect has alleged a black listing or debarment by arbitrary and capricious action on the part of the Maryland Director. In a case where a similar charge was made, the court found review under the Administrative Procedure Act to be appropriate. Gonzalez v. Freeman, 1964, 118 U.S.App.D.C. 180, 334 F.2d 570. The Court said (pages 574–575 of 334 F. 2d):

"* * * An allegation of facts which reveal an absence of legal authority or basic fairness in the method of imposing debarment presents a justiciable controversy in our view. The injury to appellants alleged in their complaint gives them standing to challenge the debarment processes by which such injury was imposed. See Copper Plumbing & Heating Co. v. Campbell, 110 U.S.App.D.C. 177, 179–180, 290 F.2d 368, 370–371 (1961)."

And more specifically to the contention of the Secretary of Agriculture that the controversy came within the exception to permissible judicial review as it involved agency action committed by law to agency discretion, the court replied (page 575):

"* * * Nothing in the statute confers unreviewable finality on determinations of the Secretary as to questions of the scope of his congressional authority or of the requisite proce-dural safeguards. Cf. Harmon v. Brucker, 355 U.S. 579, 582, 78 S.Ct. 433, 2 L.Ed.2d 503 (1958) (per curiam)."

Jurisdiction being dependent upon a finding that the Maryland Director made a decision he was not authorized to make under his delegated authority and therefore acted arbitrarily and capriciously, a rather extended statement of facts is required to determine whether or not these grounds exist. The court finds the facts to be as follows:

Plaintiff Harms is a graduate registered engineer, a member of a number of local and national engineering societies, active in civic work and has done substantial sanitary work for the State of Maryland and several of the Maryland Counties. He has prepared engineering plans and designs for some 3,000 lots in sixteen subdivisions on which the F.H.A. has issued final commitments. There is no record of any complaint as to the adequacy and accuracy of any of these plans.

Harms' engineering capacity and ability are conceded by the Maryland Director, and in the brief filed on his behalf. The Unsatisfactory Risk Determination is based upon collateral matters, claimed by the Maryland Director to make Harms an unsatisfactory "moral" risk.

Harms prepared the engineering plans for Maryland City Corporation, which was engaged in an extensive development project, contemplating the seriatim development of fourteen Sections. He, along with two other individuals also determined by the Maryland Director to be Unsatisfactory Risks (but not parties to, or involved in, the current litigation) were "minor stockholders"[4] in Maryland City Corporation.

Final commitments were authorized by F.H.A. on Sections 1–11 of the Maryland

24; Seven Oaks, Inc. v. F.H.A., 4 Cir. 1948, 171 F.2d 917.

4. The extent of their respective holdings is not disclosed in the record. In an interoffice communication in the files of F.H.A. they are also referred to as creditors. Defendants' Exhibit 3, page 80, May 3, 1965. This was just one week before the Unsatisfactory Risk Determination of May 10, 1965. It does not appear directly to have entered into that determination.

City Corporation development. There were some complaints as to non-completion of work in Sections 1–8, but there was every reason to believe these complaints would be remedied. The F.H.A. had, however, serious and reasonable concern as to the situation with respect to Sections 9, 10 and 11, as to which little work had been done, although deposits had been made by lot purchasers. None, or very few, of the houses had been completed and several proposed completion dates had passed, without the promised performance. It was quite clear that Maryland City Corporation did not have ready cash[5] to complete Sections 9, 10 and 11. Application was made to F.H.A. for conditional commitments as to Section 12. The record does not disclose how such conditional commitments, which would in terms be restricted to lots in Section 12, would provide or release funds for Sections 9, 10 and 11; and there is a rather unpleasant implication that F.H.A. contemplated, but winked at, the possible diversion of funds from Section 12 loans for work in Sections 9, 10 and 11. The F.H.A. was adamant, however, that no conditional commitments would be made as to Section 12, "or subsequent sections" unless satisfactory assurances were obtained from Harms and the other two small minority stockholders of Maryland City that down payments already made with respect to lots in Sections 9, 10 and 11 would be repaid if work were not completed thereon, and also that "in Section 12 and subsequent Sections, all down payments" were to be "held in escrow, in a manner acceptable to the F.H.A."[6]

Financial statements were secured from the three minority stockholders; and on May 27, 1964, they sent to the Maryland Director the following communication:

*Re: Section 12—Maryland City*

\* \* \* \* \* \*

"The undersigned hereby guarantee to refund deposits made by contract purchasers of homes in Sections 9, 10 and 11, if the developer, Maryland City Corporation, fails to complete the dwellings and settle with the purchasers."[7]

Thereafter the F.H.A. issued ninety conditional commitments for lots in Section 12.[8]

Work was not completed in Sections 9, 10 and 11, and of course not in Section 12, and was completely abandoned in December 1964. The Maryland Director promptly reminded Harms of the letter of May 27, 1964, and although not calling upon him for any payment, requested data as to purchasers, down payments by them, and identification by Lot, Block, Section and F.H.A. case number of purchasers in Sections 9, 10 and 11 to whom no conveyance had been made.

Thereafter, the lender foreclosed on the construction mortgages it held in Sections 9–12; a declaratory judgment suit was filed by the escrow agent; and still later numerous lot purchasers filed suits in the Circuit Court for Anne Arundel County to recover, under the May 27, 1964 letter, the amounts of their deposits.

Early in May, 1965, the Maryland Director discussed with General Counsel's office the possibility of Undesirable Risk Action, and a draft of a letter, later sent, was prepared. The testimony of the Maryland Director indicates that such action was precipitated by his discovery that Harms was somehow associated with Rock Creek Estates, Inc., which, as developer, had filed a request with the

---

5. The mortgagee advised F.H.A. of its belief that Maryland City Corporation should be able to complete the entire project, because of the substantial excess of market price over the option price available to Maryland City Corporation on certain large tracts of land. Defendants' Exhibit 3, pages 135 and 136.

6. Defendants' Exhibit 3, pages 149–150, May 19, 1964.

7. Arrangements were also made to escrow subsequent deposits from contract purchasers in Sections 9, 10, 11, 12, 13 and 14.

8. Defendants' Exhibit 3, page 128, January 11, 1965.

F.H.A. for a subdivision feasibility letter. Such letter and the accompanying data, did not refer to Harms,[9] but when the Maryland Director learned that Harms' office had appeared "for a consultation with our land planner, we knew immediately that Mr. Harms was going to be a participant in the development."

Although there is no memorandum so dated, an Unsatisfactory Risk Determination as to Harms is supposed to have been made on May 10, 1965.

On May 17, 1965, the following letter was sent to Harms by the Maryland Director:

"This is to advise you that any applications for mortgage insurance under the programs of this Administration submitted by you or any firm in which you have ten percent (10%) interest, will be rejected on the basis of an Unsatisfactory Risk Determination made by this office on May 10, 1965.

"This letter is written solely for the purpose of making the above information available to you, in order that you may avoid expense in the preparation of FHA applications only to find that such applications will be rejected.

"Unsatisfactory Risk Determinations are made pursuant to provisions of the National Housing Act authorizing the Federal Housing Commissioner to insure mortgages provided that he make approriate findings determining the economic soundness and acceptable risk characteristics of the mortgage transactions. He is not directed by the statute to insure mortgages and throughout the provisions of the Act he is given wide discretion in determining whether he shall accept or reject applications for mortgage insurance.

"The condition of excessive and unwarranted risk to the Federal Housing Administration causing such Unsatisfactory Risk Determination has arisen from your failure to perform under the written guarantee that you made to this Administration under date of May 27, 1964, which guarantee reads as follows: 'The undersigned hereby guarantee to refund deposits made by contract purchasers of homes in Sections 9, 10 and 11 if the developer, Maryland City Corporation, fails to complete the dwellings and settle with the purchasers.'

"An appropriate proposal by you looking forward prompt corrective action on your part, and the performance of the same as indicated above, will be considered as the basis for withdrawal of this Unsatisfactory Risk Determination. This office will be glad to discuss this with you at any time." (Defendants' Exhibit 3, page 70).

Similar letters were simultaneously sent to the other two "minority stockholders" of Maryland City. The three then employed counsel, who on May 20, 1965 wrote the Maryland Director as follows:

"This is a reply letter to your letter addressed to Messrs. Harms, Shillman and Miller, dated May 17, 1965. As legal counsel for the above-mentioned individuals, each of their letters has been turned over to me for review.

"I interpret your letter of May 17th as advising the individuals concerned that as of May 10, 1965 they, or any firm in which they, or any of them, have a 10% interest, has been determined by you to be considered an unsatisfactory risk determination and thereby, no longer have the right to participate in the Federal Housing Program.

---

9. As the Maryland Director explained (Transcript, pages 81–84), an application is made by the developer on a form asking for acceptance or non-acceptance of the site, type of construction and approximate price of the improvements. An inspection is made by an F.H.A. committee, and a report is prepared and sent to the applicant. If it tells him he may proceed he turns it over to his engineer, for topography, street layout, drainage, layout of houses; and the engineer generally calls at the F.H.A. office and goes over the job with the F.H.A. land planner.

"It is my opinion that the law governing this Program is not what you contend. I feel that such a prejudgment, on your part, without giving these three individuals any notice of such action 'prior' to your determination and without giving these individuals the right to a formal hearing in order that they may respond to such prejudgment, is without substance and is in derogation of the purposes and intent of the Congress of the United States in the setting up of the Federal Housing Administration.

"It is my opinion that the discretion vested in you is not such that it can be used in the manner set out in your letter of May 17th.

"Therefore, I respectfully request the following: First, that a formal meeting or hearing be established on a date, as soon as possible, in order that the above-named individuals be allowed to respond to your prohibiting them from participating in this Federal Housing Program. Secondly, that you hold in abeyance any Order that would revoke their participation in the Federal Housing Program, until such hearing has been held and duly completed.

"I shall appreciate your immediate response." (Defendants' Exhibit 3, pages 68 and 69).

This was referred to General Counsel's office, and a reply, prepared by that office, was sent over the Maryland Director's signature on May 26, 1965 as follows:

"This is in reply to your letter of May 20, 1965, concerning my determination that following May 17, 1965, this office would reject applications for mortgage insurance submitted by Messrs. N. Howe Shillman, Israel Miller, and John E. Harms, Jr.

"The function of the FHA is to act as an insurer of payment of mortgages. In determining whether the mortgage presents a sound risk for insurance purposes, we must necessarily consider whether unsatisfactory past experience with anyone participating in the transaction would make the risk unsound for the FHA.

"That this office would not be willing to accept applications for mortgage insurance submitted by your clients is based solely upon my administrative judgment that their participation, in view of their failure to perform under a written guarantee made this administration, would present a risk unacceptable from the underwriting standpoint of an insurer. The authority for my decision was in accordance with Section 200.200 of the FHA Regulations (24 Code of Federal Regulations, Part 200).

"As the insuring of mortgages is an administrative function based upon an FHA insuring office director's discretion in evaluating the risk involved, a formal hearing concerning a determination of unsatisfactory risk is not necessary. I cannot, therefore, grant your request for a formal hearing as such. As mentioned in my letters of May 17, 1965, to your clients, however, I would be glad to discuss the matter at any time, and an appropriate proposal for performance under the guarantee would be considered the basis for withdrawal of the unsatisfactory risk determination. If you and your clients wish to discuss this matter further, I shall be pleased to do so in my office at a mutually convenient time." (Defendants' Exhibit 3, page 58).

A conference was held in the Maryland Director's office on June 1, 1965. Counsel for the three minority stockholders of Maryland City protested the "prejudgment," and the harm to his clients. The Maryland Director stated that if they complied with the "guarantee" this would be a basis for reconsideration. He also advised that even if a court held they were not liable "the F.H.A. could still retain their names on the Unsatisfactory Risk Determination list because we may feel that they would be unsatisfactory risks, basically because of the fact that they had made a promise to

this office which they had not fulfilled." [10]

In the latter part of September 1965, the Maryland Director, by a memorandum of which no copy has been found, apparently raised with General Counsel the question of the propriety of advising a developer of a project that the Maryland Director would not issue a subdivision feasibility letter when the engineering work was to be performed by Harms or "his company." General Counsel suggested a form of letter [11] which was sent to Rock Creek Estates [Inc.] on October 21, 1965, as follows:

"This concerns your request for a letter of feasibility for this proposed development of Rock Creek Estates. A study for the purpose of determining the feasibility of the proposed development will not be continued by the FHA because of the participation of Mr. John Harms, Jr., in the preparation of the engineering plans for the development. However, if you wish to resubmit your proposal without participation by Mr. Harms or any organization with which he may be affiliated, we will continue to study feasibility of the development.

"My decision to discontinue the study of your proposal is necessary because of my determination on May 10, 1965 that his participation in transactions affecting mortgage insurance by the FHA would present an unsatisfactory risk for the FHA.

"Although Mr. Harms has been fully informed on this matter, I would not consider it proper to discuss with others the basis for the unsatisfactory risk determination affecting Mr. Harms, but would certainly be willing to discuss with you the conditions under which the FHA would continue feasibility studies for your proposal." (Defendants' Exhibit, page 37).

It also appears from the F.H.A. file that by letter of November 9, 1965, the Maryland Director was advised by the Veterans Administration that on November 2, 1965, after receipt of copies of the May 17, 1965 letter of the Maryland Director, the three minority stockholders of Maryland City to whom the May 17, 1965 letter was addressed were advised that the Regional Office of the Veterans Administration "also refuses to accept appraisal requests for GI loans until you notify this office that you [Maryland Director] will again honor their application for mortgage insurance." [12]

With respect to Rock Creek Estates, Inc., Harms testified without contradiction or question that he had no financial interest in Rock Creek; that his only relation to the project was that of engineer; that he was not employed by Rock Creek Estates, Inc., but by individuals; that his compensation was not related to selling price or construction costs but was "on a time, on a cost plus bases"; that there was no relationship between his engineering contract and commitments for financing; that his firm billed on a monthly basis "and anticipate payment within the month following the period for which we bill in each case * * * which in most cases is quite some time before even the application for conditional commitment is normally filed by the builder", and that his firm was often "quite some distance into a job before the application is filed with the F.H.A. or for mortgages."

As to Rock Creek, Harms was clearly not an applicant for mortgage insurance, and did not have a ten per cent or any other interest in that corporation. The first two foundation paragraphs of the Maryland Director's letter to Harms of May 17, 1965 were therefore clearly in-

---

10. Defendants' Exhibit 3, page 49.

11. Defendants' Exhibit 3, pages 38 and 39. This also suggested a form of letter to a builder who was employing, or proposed to employ, another of the Maryland City minority stockholders as a subcontractor. Further reference will be made to this suggestion.

12. Defendants' Exhibit 3, page 36.

applicable, and constituted no ground for refusing to process applications by Rock Creek.

The letter of the attorneys for Harms of May 20, 1965 to the Maryland Director apparently caused him and General Counsel to reconsider their position. In the Maryland Director's reply of May 25, 1965, there is no reference to a ten per cent [13] or other financial interest. While reference is made to rejection of "applications for mortgage insurance submitted by" Harms, et al., the scope of rejection is enlarged to a consideration of "unsatisfactory past experience with any one *participating* in the transaction" (emphasis supplied). In the Rock Creek letter of October 21, 1965, the bases of rejection are stated to be "the participation of Mr. John Harms, Jr., in the preparation of the engineering plans of the development;" "participation by Mr. Harms or any organization with which he may be affiliated" or "his participation in transactions affecting mortgage insurance by the F.H.A. * * * " [14]

Justification for his action is placed by the Maryland Director exclusively upon the provisions of Section 200.200 of the F.H.A. Regulations (24 Code of Federal Regulations, Part 200.) The court considers, however, that Sections 200.190 and 200.203 also are relevant. These read as follows:

### Subpart H—Enforcement Remedies
#### Refusal of Participation
§ 200.190 Authority of Director.

"Any official designated by the Commissioner as the Director of a Field Office is authorized to refuse the benefits of participation (either directly as a borrower, or indirectly as a builder, contractor, dealer, salesman, or sales agent for a builder, contractor or dealer) under Title I, II, VI, VII, VIII or IX of the National Housing Act, as amended, to any person or firm (including but not limited to any individual, partnership, association, trust, or corporation) if the Director has determined that such person or firm:"

      *    *    *    *    *    *

#### Unsatisfactory Risk Determination
§ 200.200 Basis of Action.

"Any Field Office Director may reject an application for mortgage insurance on the grounds of unsound credit or unsatisfactory past experience. Applications will be rejected where past experience with the proposed borrower, builder or other participant in the mortgage transaction indicates that his previous conduct or method of doing business has been

---

13. The Maryland Director's testimony as to the origin of this ten per cent interest qualification was extremely vague, being to the effect that it was "a matter of phrase that has been used in F.H.A. regulations" (Transcript, page 88); that it was "in a specific form and in a part of the regulations or were used in some regulations of the F.H.A." (Transcript, page 89); that it meant "an interest in the promotion and development of the project" and he did not know what standard of measurement is set up to arrive at ten per cent (Transcript, page 89).

The morass of the magic ten per cent is fully shown in General Counsel's memorandum of October 8, 1965 to the Maryland Director, with respect to notifying developers of the status of the three minority stockholders of Maryland City. As to Harms, his suggested letter was followed verbatim in the letter of October 21, 1965 to Rock Creek Estates.

General Counsel also dealt with the matter of notifying developers of the status of N. Howe Shillman, one of the three Maryland City minority stockholders, who was a contractor, apparently for insulation. General Counsel advised the Maryland Director that he could notify a builder using or contemplating using Shillman as a subcontractor "where the subcontract would amount to ten per cent or more of the cost of construction." But in the next paragraph of the memorandum, being the first paragraph of a draft of such letter, the language employed refers to rejection of applications "when it is found that Mr. Shillman, or any firm in which he has a ten per cent interest, is participating in the transaction * * * " (Defendants' Exhibit 3, pages 38–39).

14. Defendants' Exhibit 3, page 37.

such that his participation in the transaction would make it unacceptable from the underwriting standpoint of an insurer. The Unsatisfactory Risk Determination action is usually temporary in nature and may be followed in aggravated cases by the application of section 512 procedures as set forth in § 200.190 et seq."

\* \* \* \* \* \*

§ 200.203 *Restatement.*

"Reinstatement of persons and firms whose applications or requests have been rejected under Unsatisfactory Risk Determination procedure is within the discretion of the Director. The Director may entertain any proposal whereby the persons or firms affected make arrangements which will correct the conditions leading to the original determination. The arrangements for corrective action include proper assurances of future compliance in specified matters and agreement to abide by all applicable FHA regulations. Satisfactory corrective action having been taken the Unsatisfactory Risk Determination is rescinded and withdrawn and the persons and firms are reinstated."

Section 200.200 refers to rejection of "an application for mortgage insurance on the grounds of unsound credit or unsatisfactory past experiences." This phrase alone would imply that the unsatisfactory past experience would have been with the applicant. This section continues, however, by referring to past experience with, but with only, "the proposed borrower, builder or other participant in the mortgage transaction

\* \* \*." [15] Harms on the facts is not, and is not claimed to be, an applicant [16] with respect to the Rock Creek development; and there is no claim, or the slightest evidence, that he is a borrower or builder, either with respect to Rock Creek, or any development. For section 200.200 to be authority for the Maryland Director's action, Harms must be found to be a "participant."

The court has not been referred to, or found, any judicial decision or administrative holding (other than as the letter of May 17, 1965 may be considered such) construing the word "participant" as used in Section 200.200; nor any other analogous interpretation. The solution must therefore be sought by an effort to determine the meaning from the language itself, and to test any tentative conclusion by its practical effects.

Section 200.200 refers to the proposed borrower, builder or other participant in the mortgage transaction. Applying noscitur a sociis, the "other participant" should be one such as a borrower or builder—one having a direct financial interest in the ultimate success or failure of the enterprise, so far as the insurer is concerned. The nature of the necessary interest is further evidenced by the provisions of Section 200.190, where a Director of a Field Office is authorized "to refuse the benefits of participation (either *directly* as a borrower, or *indirectly* as a builder, contractor, dealer, salesman, or sales agent for a builder, contractor or dealer)" (emphasis supplied) on certain grounds. In Section 200.203, the Director is given blanket discretion to reinstate persons and firms

---

15. The past experience with the proposed borrower, builder or other participant must have been "such that his participation in the transaction would make it unacceptable from the underwriting standpoint of an insurer." This becomes important only if the one with whom the unsatisfactory experience occurred is a "participant." While for reasons to be stated, the court finds that Harms was not a "participant" in the Rock Creek application, it will later, from an excess of caution, consider this aspect also.

16. Harms testified, and the court finds as a fact, that he had only a fee, and not an ownership, interest in Rock Creek estates; that he has no position in any company which is the owner of Rock Creek Estates; that he had not been requested by ownership of Rock Creek Estates to contest the ruling of the Maryland Director in regard to the Rock Creek feasibility study; and that he did not appear as a representative of Rock Creek Estates.

"whose *applications or requests* have been rejected under Unsatisfactory Risk Determination procedure." (Emphasis supplied). While it probably should be assumed that that reinstatement would be applicable to any who had been debarred by virtue of an Unsatisfactory Risk Determination, the language specifically refers only to those who have made applications or requests, and not, by words, to a "participant." Inferentially, this would mean that a participant is one who has filed an application or made a request. Harms does not fall in either category. In none of the three sections is an architect or engineer mentioned; yet had such professionals been intended to be included, it would have been easy enough to include them.

The problems that would result if the definition of participant were held capable of being construed broadly enough to include an engineer, are graphically illustrated by the testimony of the Maryland Director in this case (pages 84–88):

"BY MR. SULLIVAN:

"Q Now would you define, in your own mind at least, the word 'participant,' as you have just used it?

"A Well, my description of a participant is anyone who participates in any way, shape or form in the development of a subdivision, and who may obtain his reimbursement through financing or sales of homes in that subdivision.

\* \* \* \* \* \*

"THE COURT: May I go back to that, that a participant is anyone who participates in any manner of development of the subdivision who may obtain his compensation through the financing and sale of lots or houses.

"Now, suppose that you are directly told that the person is to be paid a flat fee, regardless of whether or not any sales are effected, would he nevertheless be, under your definition, a participant?

"THE WITNESS: He would be.

"BY MR. SULLIVAN:

"Q Would a lawyer representing a developer be considered a participant under your definition?

"A I would say so.

"Q Would an architect?

"A I would say so.

"Q Would the mortgage broker be considered a participant?

"A I would think so.

"Q Could you think of any particular job function or duty that might be performed by any person not connected directly with the building company which would not be considered a participant in accordance with your definition?

"A Not right off hand.

"THE COURT: Anyone who has any association with the project, and who is interested in seeing it succeed, whether or not his compensation is dependent upon success, or is independent of success would be a participant in your understanding?

"THE WITNESS: That is correct.

\* \* \* \* \* \*

"THE COURT: May I, before we go there, because I am naturally quite interested in the definition of participant—would that apply, Mr. Borcherding, and understanding I am asking for information; I am not being in the least critical or reaching any conclusion—would it apply to what, perhaps, not in the best language, might be referred to as a one-shot proposition?

"Suppose that the developer wanted to know what the sub-surface conditions were, and he hired someone to make test borings for him, and he did it so much per linear foot, or whatever the rate of pay is, and he then prepared a report, and he says, 'I made 24 test borings to a depth of 36 feet,' and indicates those points on a plat, and says that, 'I find the following sub-surface conditions, and my charge is so much per foot, or flat fee', and he

submits that and gets paid. Would he become in the nature of a participant?

"THE WITNESS: In my opinion, he would.

\* \* \* \* \* \*

"THE COURT: Mr. Borcherding, do you know to what extent, if at all, your definition or concept of a participant has received acceptance or is based upon any interpretation or instruction, or is it your summary of what you believe to be the case based on your practice, or what is the origin?

"THE WITNESS: It is based on my interpretation of our regulations and my opinion of these interpretations."

Whatever the proper definition of participation may be, the court finds as a fact and concludes as a matter of law that Harms is not as to the proposed Rock Creek development, and would not as to any other development in which his sole interest was that of an engineer, be a "participant" in a "mortgage transaction" under Section 200.200 or any other Section of the F. H. A. Regulations. The court therefore concludes that the decision of the Maryland Director here attacked was unauthorized, arbitrary and illegal.

The foregoing is, of course, except as to the form of relief to be given, dispositive of the case in this court. However, at the conclusion of the hearing in this case, the court indicated its intention, because of the importance of the decision, especially to Harms, to consider what the outcome would be if Harms were (contrary to what is now the court's firm opinion) found to be a "participant."

The Maryland Director's determination that Harms' previous conduct or method of doing business had been such that his participation in the transaction would make it unacceptable from the underwriting standpoint of an insurer is based solely upon the Maryland Director's conclusion that Harms as an individual had made a promise to the Maryland Director which Harms did not keep. To the Maryland Director it is irrelevant that Harms' refusal to repay depositors for their deposits prior to May 27, 1964 on lots in Sections 9, 10 and 11 was based on advice of counsel;[17] that the question of Harms' liability vel non is now pending before the Circuit Court for Anne Arundel County[18]; that Harms is able to pay any judgment that may be rendered against him; that the May 27, 1964 letter was executed by Harms in his individual, not his professional, capacity; that Harms has no personal liability on or with respect to the Maryland City mortgages, and would have none to any mortgagees of, or insurer of mortgages on, the Rock Creek development; and that neither the letter of May 27, 1964, nor the failure to pay thereunder, had any relation to the failure of the Maryland City development.

The position of the Maryland Director is that regardless of the outcome of the litigation involving the construction and effect of the May 27, 1964 letter, Harms made a promise which he failed to honor, and that was a continuing, unchanged situation, and that therefore the Maryland Director would always regard him as an unsatisfactory risk. It was suggested to the Maryland Director that the collateral wickedness, if any, of Harms, did not affect his professional ability or capacity any more than would a failure to pay the purchase price of a Rolls Royce; that properly prepared plans would carry off drainage water

17. Who were not the counsel who prepared the communication of May 27, 1964.

18. This court has no occasion to express, and of course expresses no opinion as to the merits of this litigation. The court from the testimony herein understands that the defenses are, at least in part, that the May 27, 1964 letter did not express the entire understanding, between the parties, in that, although not therein expressed, the Maryland Director was also to issue conditional commitments for lots in Sections 13 and 14; that the lot purchasers were not third party beneficiaries; and that they did not know of or rely upon the letter of May 27, 1964.

and sewage whether the plans were prepared by a saint or a sinner; that steel beams would withstand stresses in the same manner whether the same plans were prepared by an engineer in the death cell or one about to receive an honorary degree; and that the financial success or failure of a development was completely unrelated to the morals of the engineer, if his plans were proper and sound. The nearest to an answer that was offered was that one who would not honor an undertaking, even if legally unenforceable, might under "stress" do a poor job. What would be the source or nature of this "stress" was not suggested.

This adamant approach that the (assumed) failure to honor a personal promise would forever bar an engineer from participating in his professional capacity in any F. H. A. insured project seems to the court to involve a non sequitur, and to be arbitrary. It permits the Maryland Director to impose sanctions with respect to a personal undertaking, possibly unenforceable, greater in severity than those which could be imposed by a court if the undertaking were legally enforceable; and if legally enforceable, the Maryland Director's debarment is cumulative. The maximum court judgment would be for the amount of the lot purchase deposits (perhaps plus interest, but subject to contribution from the other promisors). The damage from the debarment is at the least the loss of fees for engineering services in the Rock Creek development, and all other fees that Harms could earn from applicants for F. H. A. insurance. While testimony as to specific losses in dollars and cents was not offered, it was clear that it would be substantial.

No evidence was offered by either side as to what the effect of the facts under discussion would have been upon an insurer of mortgages. The only witness in any way nearly approaching the question was a mortgage banker and mortgagee. His testimony was to the effect that (without attempting to construe F. H. A. Regulations) his organization, on behalf of lending institutions, did not consider the engineer engaged by a prospective developer to be a participant in a mortgage transaction unless he was "an equity participant, in other words, one of the owners of the project." (Tr., p. 160). Often the engineer's work will have been fully completed by the time the mortgage application comes in to the lender; and the engineer may have done all the work necessary "for the approval of both the mortgage lender and the county authorities and the F. H. A." (Tr., p. 164). When plans are received in connection with an application the engineer is generally known; when he is not, inquiries about him are generally not made; "we don't consider him that important to the job, and we know that his work is going to be carefully examined by the county authorities in all cases * * *" (Tr., p. 174).

The court therefore finds as a fact, and concludes as a matter of law, that even if Harms were a participant, his unfulfilled promise to repay certain deposits could in no conceivable way make his participation as an engineer in the mortgage transaction such that it would make the mortgage transaction unacceptable from the underwriting standpoint of an insurer. Consequently, his debarment from participation as an engineer was arbitrary, and without any substantial evidence to support it.

Accordingly, this court has jurisdiction over the instant cause of action under 5 U.S.C. § 1009. Plaintiff will be permitted, pursuant to the liberal amendment provisions of 28 U.S.C. § 1653, to amend his complaint to assert such a ground for jurisdiction.

Harms is, under the above findings of this court, therefore, entitled at least to a judgment that the F.H.A. may not refuse to consider subdivision feasibility, or to process applications for mortgage insurance, solely on the ground that Harms may have prepared the engineering plans for the properties as to which such applications have been made.

The court hopes that with this declaration the parties may be able to compro-

mise their differences. If this cannot be done within ten days, counsel for plaintiff shall submit a proposed decree, and if within five days thereafter the remaining defendant objects either to the form or substance, the matter will be set for prompt hearing.