**The STATE OF DELAWARE, on her behalf and on behalf of her residents,**
**Plaintiff,**

v.

**Admiral Chester R. BENDER, Commandant, United States Coast Guard, Individually and in his official capacity, and Rear Admiral Ross P. Bullard, Commander, Fifth Coast Guard District, United States Coast Guard, Individually and in his official capacity, Defendants.**

**Civ. A. No. 4767.**

United States District Court,
D. Delaware.

Jan. 28, 1974.

---

Jerome O. Herlihy, Chief Deputy Atty. ·Gen., Wilmington, Del., for plaintiff.

Ralph F. Keil, U. S. Atty., and Bruce L. Thall, Asst. U. S. Atty., Wilmington, Del., for defendants.

---

1. The complaint prays for a temporary restraining order and for a permanent injunction but does not in terms ask for a preliminary injunction.

2. 28 U.S.C. § 1337 reads:
 "The district courts shall have original jurisdiction of any civil action or proceeding

OPINION

EDWIN D. STEEL, Jr., Senior District Judge:

The plaintiff, the State of Delaware, has brought an action on its own behalf and on behalf of its citizens against the defendants, Admiral Chester R. Bender, Commandant, U. S. Coast Guard, and Rear Admiral Ross P. Bullard, Commander, Fifth Coast Guard District, individually and in their official capacities. The complaint alleges the invalidity of a permit dated October 20, 1970, as amended July 9, 1973, issued by the Commandant to the State of Maryland authorizing the construction of a fixed-span bridge with a vertical clearance of 40 feet at mean high water, across the Nanticoke River, a navigable waterway, at Sharptown, Maryland. The complaint prays for a declaratory judgment adjudging the permit to be invalid and enjoining the defendants from continuing it in effect. The action is before the Court upon plaintiff's oral motion for a preliminary injunction.[1] The motion is supported by a verified complaint and amendment, and is opposed by affidavit of Kenneth G. Wiman.

*Jurisdiction of the Court exists under 28 U.S.C. § 1337.[2]*

In 1946, by the enactment of the General Bridge Authority Act of 1946, 33 U.S.C. § 525 et seq., Congress gave its consent generally to the construction, maintenance and operation of bridges and approaches thereto over the navigable waterways of the United States. This consent was expressly made subject to approval of the location and plans for such bridges by the Chief of Engineers and the Secretary of the Army who were empowered to impose specific conditions relating to the maintenance and operation of the bridges which they

arising under any Act of Congress regulating commerce . . ."
The General Bridge Authority Act of 1946, 33 U.S.C. § 525 et seq., here involved, is such an act.

deemed necessary in the interest of public navigation. Effective October 15, 1966, the Congress transferred the functions of the Chief of Engineers and Secretary of the Army relative to the issuance of bridge permits to the Department of Transportation. 49 U.S.C. § 1655. Thereafter, effective April 1, 1967, the Secretary of Transportation delegated to the Commandant of the United States Coast Guard the authority to exercise the functions, powers and duties relating to the issuance of bridge permits formerly exercised by the Army. 49 C.F.R. §§ 1.4(a)(3), 1.46. By virtue of his position as Commandant of the Coast Guard, the defendant, Admiral Bender, is vested with the responsibility and power to receive applications and issue permits for the construction of bridges over navigable waters. 33 C.F.R., Parts 114–115. By virtue of his position as District Commander of the Fifth Coast Guard District, the defendant, Rear Admiral Bullard, is empowered to make findings of fact, hold hearings and otherwise consider applications for permits to build bridges across navigable waters in his district, 33 C.F.R. §§ 115.50–115.60, which includes Maryland. 33 C.F.R. § 3.25. The official residence of Admiral Bender where he conducts his official acts is within the District of Columbia. The office wherein Rear Admiral Bullard conducts his official acts is located in Portsmouth, Virginia.

In Elco Corporation v. Microdot, Inc., 360 F.Supp. 741 (D.Del.1973), Judge Stapleton summarized the criteria which must exist before a preliminary injunction will issue. He said at p. 746:

> "Where preliminary injunctive relief is sought the Court must weigh the potential of irreparable harm to the plaintiff absent judicial intervention, the potential of irreparable harm to the opposing party from judicial in-

terference, the potential harm to the public interest and the likelihood of the plaintiff's prevailing on the merits. Allis-Chalmers Mfg. Co. v. White Consolidated Indus., Inc., 414 F.2d 506 (3rd Cir. 1969); Winkleman v. New York Stock Exchange, 445 F.2d 786 (3rd Cir. 1971); Nelson v. Miller, 373 F.2d 474 (3rd Cir. 1967)."

Plaintiff has the burden of satisfying these requirements.

Defendants claim that the motion for a preliminary injunction should be denied for the following reasons: (1) the defendants are not subject to suit because of the doctrine of sovereign immunity, (2) the State of Maryland and Wicomico Construction Company ("Wicomico")[3] are indispensable parties which have not been joined, (3) venue is lacking in this district, and (4) the motion is otherwise lacking in merit.

*Sovereign Immunity*

Relief which is sought nominally against officers of the government, as in the instant case, is in fact against the United States since the decree would operate against the latter. Hawaii v. Gordon, 373 U.S. 57, 58, 83 S.Ct. 1052, 10 L.Ed.2d 191 (1963). Here it is unnecessary to give the sovereign immunity doctrine extended consideration as was done in Littell v. Morton, 445 F.2d 1207 (4th Cir. 1971).

When the Congress created the Department of Transportation in 1966, (49 U.S.C. § 1651 et seq.), it provided for the transfer of the functions of the Coast Guard to the Department, (49 U.S.C. § 1655(b)(1)), and made proceedings in the Department and any of the administrations or boards within it subject to the provisions of the Administrative Procedure Act. 49 U.S.C. § 1655(h).[4] This constituted a

---

3. Wicomico was awarded the contract to construct the Sharptown bridge by the Maryland Department of Transportation on December 4, 1973. Affidavit of Bernard M. Evans, State Highway Administrator, Maryland Department of Transportation, Doc. No. 4.

4. Subject to exceptions not presently important, § 1655(h) provides:

> "The provisions of subchapter II of chapter 5 and of chapter 7 of Title 5, shall be applicable to proceedings by the Department and any of the administrations or

waiver of the sovereign immunity of the Coast Guard when its action is subject to review, as here, under the Administrative Procedure Act.[5]

### Indispensable Parties

■ The permit issued by the Coast Guard on October 20, 1970, as amended on July 9, 1973, is authority to the State of Maryland to build the Sharptown bridge. Maryland, therefore, has an interest relating to the subject of the action, and it is so situated that the disposition of the action, in its absence may, as a practical matter, impair or impede its ability to protect that interest. Its joinder as a party defendant will not deprive the court of subject matter jurisdiction, and it is subject to service of process. Both parties agree that Annapolis, the capital of Maryland, is not more than 100 miles from Wilmington. See Rules 4(f) and 4(d)(6), F.R.Civ.P. Under the circumstances F.R.Civ.P. 19(a) requires that it be joined as a party defendant, and an order to that effect will be entered.

The defendants also argue that Wicomico must also be considered an indispensable party. Although on December 4, 1973, it was awarded the contract to construct the Sharptown bridge, as of December 14, 1973, the Maryland State Highway Administration had not executed the pertinent contract documents.[6] The defendants assert, without supporting evidence, that Wicomico has expended sums of money in reliance upon the contract awarded to them. At page 9 of their brief the defendants admit that Wicomico cannot be served because it is located in Salisbury, Maryland, which is 104 miles from the District Court House in Wilmington. Upon the assumption that Wicomico is an indispensable party, and because it cannot be served, the defendants argue that the action should be dismissed. This contention is rejected.

Because it is not amenable to service, F.R.Civ.P. 19(a) is not applicable to Wicomico. Furthermore, it is at least doubtful whether F.R.Civ.P. 19(b) is relevant. It comes into play only if (1) complete relief cannot be accorded among those already parties in Wicomico's absence, or (2) Wicomico claims an interest *"relating to the subject of the action* and is so situated that the disposition of the action in [its] absence may (i) as a practical matter impair or impede [its] ability to protect that interest . . ."* (emphasis added). Wicomico is not within category (1), and it probably is outside of category (2). The subject of the action is the validity of the bridge permit. This is unrelated to the award of the bridge contract to Wicomico, nor does it relate to any other relationship which Wicomico has with the State of Maryland, contractual or otherwise.

But, assuming that Wicomico's status is covered by category (2), then under F.R.Civ.P. 19(b) the Court must determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed. In making this determination, the Court must consider, among other factors:

"first, to what extent a judgment rendered in the person's absence might be prejudicial to him or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or oth-

---

boards within the Department established by this chapter . . . ."

In Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed. 2d 136 (1971), the Court said at 410 n. 21, 91 S.Ct. at:

"In addition, the Department of Transportation Act makes the Administrative Procedure Act applicable to proceedings of the Department of Transportation. 49 U.S.C. § 1655(h) (1964 ed., Supp. V)."

5. In Sisselman v. Smith, 432 F.2d 750, 755 (3rd Cir. 1970), since the issuance of the bridge permit was upheld, the Court found it unnecessary to consider whether Coast Guard personnel may validly assert the sovereign immunity defense.

6. Whether it has done so since is not shown by the record.

er measures, the prejudice can be lessened or avoided; . . ."

Even upon the hypothesis that Wicomico's interest is deemed to be one "relating to the subject of the action", its interest can be protected by including in any judgment which may be adverse to defendants a provision stating that Wicomico shall not be prejudiced by the judgment in asserting any claim it may have against anyone who is now or hereafter may become a party to the litigation. With such a provision in the judgment, the Court may properly proceed with the action in equity and good conscience, and dismissal thereof because of the absence of Wicomico as a party will not be decreed.

This view finds support in Nat. Licorice Co. v. Labor Board, 309 U.S. 350, 60 S.Ct. 569, 84 L.Ed. 799 (1940).[7] Upon a complaint, the NLRB found that the licorice company had been guilty of unfair labor practices. One was persuading and coercing certain of its employees not to become union members and to sign individual contracts of employment containing provisions violative of the NLRA. An order was entered directing the company to cease and desist from giving any effect to the employment contracts. An enforcement order ultimately brought before the Supreme Court the question of the validity of the cease and desist order. The Court stated, at p. 351, 60 S.Ct. at p. 571 one of the questions to be:

"whether the Board has authority to order an employer not to enforce contracts with its employees, found to have been procured in violation of the National Labor Relations Act, . . . and to contain provisions violating that act, in the absence of the employees as parties to the proceeding; . . ."

Directing itself to this question the Court said at p. 363, 60 S.Ct. at p. 577:

"In a proceeding so narrowly restricted to the protection and enforcement of public rights, there is little scope or need for the traditional rules governing the joinder of parties in litigation determining private rights. Ordinarily where the rights involved in litigation arise upon a contract, courts refuse to adjudicate the rights of some of the parties to the contract if the others are not before it. Shields v. Barrow, 17 How. 130, 140, 58 U.S. 130, 15 L.Ed. 158; Carroll v. New York Life Ins. Co., 8th Cir., 94 F.2d 333; cf. Waterman v. Canal-Louisiana Bank Co., 215 U.S. 33, 48, 30 S.Ct. 10, 54 L.Ed. 80. Such a judgment or decree would be futile if rendered, since the contract rights asserted by those present in the litigation could neither be defined, aided nor enforced by a decree which did not bind those not present.

But different considerations may apply even in private litigation where the rights asserted arise independently of any contract which an adverse party may have made with another, not a party to the suit, even though their assertion may affect the ability of the former to fulfill his contract. The rights asserted in the suit and those arising upon the contract are distinct and separate, so that the Court may, in a proper case, proceed to judgment without joining other parties to the contract, shaping its decree in such manner as to preserve the rights of those not before it."

The Court recognized that the effect of the NLRB's order was to preclude the licorice company from carrying out any of the contract provisions. But this order, the Court said, at p. 365, 60 S.Ct. at p. 578,

"does not foreclose the employees from taking any action to secure an adjudication upon the contracts, nor prejudge their rights in the event of such adjudication."

In Natural Resources Defense Coun. v. Tennessee Val. Auth., 340 F.Supp.

---

7. The Federal Rules of Civil Procedure were not mentioned in the opinion.

400, 407–408 (S.D.N.Y.1971), rev'd on other grounds, 459 F.2d 255 (2nd Cir. 1972), plaintiffs charged that the TVA had failed to comply with the National Environmental Policy Act of 1969 in purchasing and using strip-mined coal. The private coal producers who had contracted to sell the strip-mined coal to the TVA had not been named as parties in the action. The defendants argued that the producers were indispensable parties and that their non-joinder required a dismissal of the action. This argument was rejected, the Court saying at 340 F.Supp. p. 408:

> "Plaintiffs do not seek to abrogate the contracts, but to restrain defendants from purchasing coal under them 'until such time as the requirements of the National Environmental Policy Act of 1969 are met' (Complaint p. 15). If this relief were granted, the private contractors would still be able to assert their rights against TVA, except that specific performance could not be ordered while TVA was enjoined from purchasing coal under the contracts. National Licorice Corp. v. NLRB, *supra*, 309 U.S. at 365, 60 S.Ct. 569, 84 L.Ed. 799."

So in the case at bar, plaintiff does not seek to abrogate the bridge award to Wicomico or any contract which the latter may have entered into with the State of Maryland. Plaintiff is simply attempting to preliminarily enjoin the defendants from continuing the permit as effective authority to Maryland to build the bridge. Upon the granting of this relief to plaintiff, Wicomico would still be able to assert its rights, if any, against the parties to this action except that it could not obtain specific performance of the award or any contract implementing it so long as the construction of the bridge by the State was held up due to the absence of a valid permit.

### Venue

Venue has been laid under 28 U.S.C. § 1391(e) which reads:

> "A civil action in which each defendant is an officer or employee of the United States or any agency thereof acting in his official capacity or under color of legal authority, or an agency of the United States, may, except as otherwise provided by law, be brought in any judicial district in which:
> . . . (4) the plaintiff resides if no real property is involved in the action."

Defendants assert that the Coast Guard permit authorizes the construction of a bridge, therefore the action involves real estate, and for this reason § 1391(e) cannot be a valid basis for venue in this district.

The pertinent substantive facts involved in Natural Resources Defense Coun. v. Tennessee Val. Auth., *supra*, rev'd on other grounds, 459 F.2d 255 (2nd Cir. 1972), have been previously stated, *supra*, p. 11. Venue was claimed under § 1391(e)(4). Defendants moved to dismiss the action for lack of venue upon the ground that it involved real property. Rejecting this contention, the Court said at 340 F.Supp. p. 406:

> "Gravity being what it is, the vast bulk of human activities take place on the face of the earth. Consequently, almost any dispute over public or private decisions will in some way 'involve real property,' taken literally. The touchstone for applying § 1391(e)(4) cannot sensibly be whether real property is marginally affected by the case at issue. Rather, the action must center directly on the real property, as with actions concerning the right, title or interest in real property.
>
> \* \* \* \* \* \*
>
> Plaintiffs here do not seek an adjudication of the validity of defendants' title, leases, or mineral rights, however. Though contracts with third-parties for production of coal might be affected by plaintiff's requested relief, there is nothing inherent in that relief that could not be as easily done by this court as, for example, a court sitting in Tennessee. Environmental Defense Fund v. Corps

of Engineers, *supra*, at 1285. Cf. Harms v. Federal Housing Administration, 256 F.Supp. 757, 760–761 (D. Md.1966). Thus, we find that real property is not involved here within the meaning of that section." (footnote omitted)

The same construction of § 1391(e)(4) was reached in Environmental Defense Fund v. Corps of Eng. of U.S. Army, 325 F.Supp. 728 (E.D.Ark. 1971), aff'd 470 F.2d 289 (8th Cir.), application for injunction denied, 409 U.S. 1072, 93 S.Ct. 675, 34 L.Ed.2d 661 (1972), where plaintiff sought to enjoin the Army from making any contracts or doing any work in furtherance of a plan to construct a dam across a river. The Court rejected the defendant's argument that § 1391(e)(4) did not provide a venue basis since "real property is involved".

 In the case at bar, the central issue is the validity of the bridge permit. While the decision may determine whether or in what manner the Sharptown bridge will be constructed, real estate will be involved only peripherally. This was not the type of involvement that § 1391(e)(4) was intended to cover. Venue in this district is proper.

### The Merits

On January 20, 1969, the State of Maryland, through its State Roads Commission, filed an application with the Commander of the Fifth United States Coast Guard District for the approval of plans and the location of a new all fixed-span bridge over the Nanticoke River at Sharptown, Maryland to be located approximately 500 feet upstream from the existing bridge and approximately 25 miles upstream from the mouth of the waterway.

The Nanticoke River rises in the northern part of Sussex County, Delaware (the southernmost county of the State) and flows in a southwesterly direction for about 50 miles, emptying into the head of Tangier Sound on the eastern side of the Chesapeake Bay. Seaford, Delaware is located on the Nanticoke River upstream from the proposed bridge at Sharptown.

The decision whether a permit should issue to construct a bridge over navigable water must rest primarily upon the effect of the proposed work on navigation. 33 C.F.R. § 114.10(a).

Section 115.60 of 33 C.F.R. describes "Procedures for handling applications for bridge construction authorization." Subparagraph (b) provides that if an application for a bridge permit is not defective on its face the District Commander is required to give public notice that the application has been filed and proceed with the case. In accordance with this requirement, a public notice of the bridge proposal was issued on January 28, 1969, which invited written protests or comments concerning the work to be made to the Chief, Aids to Navigation Branch, Fifth Coast Guard District in Portsmouth, Virginia. No public hearing was held.

A public hearing is not required except in the limited circumstances specified in § 115.60(c). It states:

"(c) *Notice and hearing.* (1) Public hearings will be held on those cases which are of special importance or where significant differences of opinion have not been resolved."

Pursuant to 33 C.F.R. § 115.60(d), on October 21, 1969, the Commander, Fifth Coast Guard District, filed a report with the "Commander"[8] which stated that in response to the public notice, objections to the proposed vertical clearance of 40 feet were received from six persons and firms. So far as the record reveals, no request for public hearing was made by any of them. The report stated that the Maryland State Roads Commission was furnished names and addresses of the objectors in order that the Commission and objectors would have an opportunity "to resolve their differences." The report contains no finding that these dif-

---

8. Apparently this was a typographical error and was intended to read "Commandant."

ferences had been resolved. The report stated further that only three vessels—two tugboats and a sailboat—"presently using" the waterway upstream from Sharptown required greater vertical clearance than the plans called for, that the cargoes which moved on the river included fresh fish, grain, shellfish, shells, pulpwood, fertilizer, oil products, tar, asphalt, slag and mineral products, and that "[t]here is a good potential for future commercial, industrial and physical development on the Nanticoke River." The Commander concluded his report by stating that "The proposed bridge provides for the reasonable needs of navigation" and that "a permit for its construction should be issued." A copy of the report is attached to the complaint as Exhibit B.

On October 20, 1970, the permit issued. It stated that unless construction was commenced within two years the approval of the bridge should cease and be null and void. The construction was not begun within this period and the permit became null and void by its terms.

By letter dated December 5, 1972, the State Highway Administration of Maryland filed an application with the Commander of the Fifth District to have the permit for the bridge reinstated. On December 15, 1972, public notice of the application was given inviting written protests or comments concerning the proposed work. Objections were filed by numerous individuals, towing and transportation companies, operators of businesses served by these companies, the City of Seaford,[9] the Chamber of Commerce in Seaford, and the Department of Community Affairs and Economic Development of the State of Delaware, all claiming that the 40′ vertical clearance proposed for the bridge was too low. The complaint, in paragraph 15, summarized the general areas of opposition as follows:

"A. Such a low clearance would have and [sic] adverse impact on the abili-

ty of some commercial shipping presently using the Nanticoke to reach Seaford, by either causing the ships to be modified or preventing them from navigating past the bridge at Sharptown to Seaford . . . .

b. Such a low vertical clearance would have an adverse impact and cause irreparable harm to pleasure boating (navigation for recreational or noncommercial usage) using the Nanticoke upstream from Sharptown by preventing such vessels from reaching Seaford or requiring modifications to the vessels so that they can sail under the bridge. . . .

c. Such a low vertical clearance would prevent and curtail future growth of commercial and pleasure boating on the Nanticoke River above Sharptown, Maryland and cause economic stagnation in western Sussex County in which Seaford is located. Since the Seaford area is a growing and economically viable area, a fixed-span, 40 foot vertical clearance bridge at Sharptown would cause irreparable harm to the future economic well-being of Seaford and the rest of western Sussex County. . . .

d. The construction of the bridge with such a low clearance would place Seaford as a port at an economic disadvantage with nearby ports, particularly Salisbury, Maryland. . . .

The Department of Community Affairs and Economic Development of the State of Delaware asked that action by the Coast Guard be withheld until after a public hearing had taken place in the Seaford area. This request was ignored and no public hearing was held.

The Nanticoke River is the only access to and from Delaware to the Chesapeake Bay with the exception of the Chesapeake and Delaware Canal at the northern end of Delaware, and the Nanticoke is the only river in Sussex County navigable to commercial vessels. Apart

9. It spoke of the large oil and grain business and "huge DuPont Nylon Plant" located in Seaford.

from the Nanticoke River, Sussex County and southwestern Delaware are accessible only by highway and the Penn Central Railroad. If the railroad service should be terminated, or as was recently the case, temporarily interrupted due to damage to the Summit Bridge over the Chesapeake and Delaware Canal, the transportation service afforded by the Nanticoke River probably would become increasingly important to southwestern Delaware.

Before acting upon the application to reinstate the permit, the Coast Guard asked objectors for the names of vessels that would be affected by a 40' clearance and were given the following information:

| "Name of Vessel | Owner | Height |
|---|---|---|
| Evelyn | Salter Marine, Norfolk, Va. | 45 feet |
| Frank Johnson | Allied Towing Co., Norfolk, Va. | 40 feet |
| Falcon | Allied Towing Co., Norfolk, Va. | 40 feet |
| Warren Gass | Allied Towing Co., Norfolk, Va. | 45 feet |
| Ospray | Allied Towing Co., Norfolk, Va. | 45 feet |
| Carl | Norfolk Towing & Freighterage | 41 feet |
| Evelyn | Norfolk Towing & Freighterage | 43 feet |
| Bay Prince | Bay Towing Co., Norfolk, Va. | 40 feet |
| Carolinian | Carl Anderton, Salisbury, Md. | 47 feet |
| Margaret | Tucker Towing Co., Phila., Pa. | 46 feet |
| Shamokin | Tucker Towing Co., Phila., Pa. | 49 feet |
| Anne | Tucker Towing Co., Phila., Pa. | 46 feet |
| Birgit Ann | Eastern Marine Equipment Co. | 48 feet |
| Sailboat owned by | Mr. McCord, Seaford, Del. | 42 feet |
| Sailboat owned by | Mr. Spicer, Seaford, Del. | 40 feet (approx.)" |

It was informed that probably the following vessels would have to have their appurtenances altered to permit them to pass under a 40' bridge:

| "Name | Owner |
|---|---|
| EVELYN | Salter Marine |
| BAY PRINCE | Bay Towing Company |
| CAROLINIAN II | Carl Anderton |
| SHAMOKIN | Tucker Towing Company |
| BIRGIT ANN | Eastern Marine Equipment Co. |
| COURIER | Interstate Oil Transportation Co. |
| ROLETA | Interstate Oil Transportation Co." |

It likewise learned that the following establishments were served by tugs and barges operating on the Nanticoke River:

"Pure Oil Co., Seaford, Del.
Peninsula Oil Co., Seaford, Del.
Cargill Grain Co., Inc., Seaford, Del.
Allen Petroleum Co., Seaford, Del.
Getty Oil Co., Seaford, Del.
Royster Fertilizer Co., Seaford, Del.
Valliant Fertilizer Co., Laurel, Del.
Delmarva Power & Light Co., Vienna, Md.
City Docks, Vienna, Md.
Thomas Grain Co., Vienna, Md.
Chesapeake Corp. of Virginia, Sharptown, Md."

The report dated May 30, 1973 from the Commander of the Fifth Coast Guard District to the Commandant referred to the proceedings which had been taken, the results of the Coast Guard's original investigation, including its original findings of fact, and its "recent" investigation which included supplemental findings of fact. It concluded that the proposed bridge would provide "for the reasonable needs of navigation", contained a recommendation that the bridge permit of October 20, 1970 be reinstated, and specified 3 and 5 years, respectively, for commencing and completing the construction.[10]

On July 9, 1973, an order was issued which reinstated the permit of October 20, 1970 and provided for the commencement and completion of construction by June 20, 1976 and June 20, 1978, respectively.

On December 4, 1973, the State Highway Administration, Maryland Department of Transportation, awarded the contract for the construction of the bridge to Wicomico. As of December 14, 1973, the pertinent contract documents had not been executed. The Administrator of the State Highway Administration has undertaken, when and if such contract documents are executed, not to give notice to proceed to the construction company prior to February 1, 1974.

■ The issuance of a permit to construct a bridge under the General Bridge Authority Act of 1946, 33 U.S.C. § 525, is administrative agency action which an aggrieved party has a right to have judicially reviewed under the Administrative Procedure Act, 5 U.S.C. § 702. The scope of the allowable review is specified in 5 U.S.C. § 706. Sisselman v. Smith, 432 F.2d 750 (3rd Cir. 1970). Plaintiff, suing on its own behalf as *parens patriae* is an aggrieved party and has standing to sue.

5 U.S.C. § 706(2) provides that in reviewing agency action a Court "shall hold unlawful and set aside agency action, findings, and conclusions" which it finds to be

"(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

\*　\*　\*　\*　\*　\*

(D) without observance of procedure required by law;"

In the instant case, failure of the defendant to hold a public hearing prior to reinstating the bridge permit violated the procedural requirement of § 115.-60(c), which had the force of law. *Cf.* Accardi v. Shaughnessy, 347 U.S. 260, 265, 74 S.Ct. 499, 98 L.Ed. 681 (1954).

Under this regulation public hearings are required in cases ". . . where significant differences of opinion have not been resolved." It cannot be disputed that "differences of opinion" existed concerning the advisability of extending the permit to authorize the construction of a bridge with a vertical clearance of only 40′. Nor can there be any question about the fact that the differences of opinion had not been resolved. Captain Wiman's affidavit of January 9, 1974, states that in reviewing Admiral Bullard's recommendation that the bridge be built "he determined that a public hearing was not necessary in that . . . all significant differences of opinion [were] recognized." [11] This is

---

10. The report of May 30, 1973 and attached supplemental findings of fact are attached as Exhibit 5 to the affidavit of Kenneth G. Wiman, verified January 9, 1974.

Plaintiff claims, *inter alia*, that the report failed to comply with § 115.60(d)(2) in omitting the barge data which it required. In the context of the present case the barge information would have been superfluous. Nor is plaintiff's claim that the report failed to comply with § 115.60(d)(3) a valid one. The proposed bridge at Vienna, Maryland which plaintiff alludes to in paragraph 21 of its complaint has never been authorized so far as appears from the complaint. It is in the application stage only and so far as the record reveals there is no certainty that it will be built. Section 115.60(d)(3) has no application to it.

11. In paragraph 11 of Captain Wiman's affidavit, he states that in his position as Chief of the Bridge Division, he had "authority to either approve, or disapprove, the recom-

irrelevant. Obviously, there is an important distinction between *resolving* differences of opinion and *recognizing* them.

The only question, then, is whether the differences of the unresolved opinions were "significant" within the meaning of § 115.60(c). This determination did not lay within the unreviewable discretion of Coast Guard personnel. The defendants were not especially qualified by training or experience to make such a determination. The meaning of "significant", in the context of its usage, demanded no Coast Guard expertise. When the principal dispute, as here, relates to the meaning of a regulatory term requiring no special administrative competence to decide, the Court is relatively more qualified to perform the interpretive function. *Cf.* Barlow v. Collins, 397 U.S. 159, 165–166, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970).

On the basis of the present record, the Court finds that the differences of opinion were "significant" within the meaning of § 115.60(c). They were rational and in no sense captious. Nor were the objections of concern to only a few persons having dubious or remote interests in the bridge. On the contrary, the objections came from numerous persons and business enterprises, many of whom had reasons to be directly concerned with the impact which the bridge would have upon them or their businesses, either presently or prospectively. The gravity of at least some of the objections commend themselves to consideration by defendants only after all points of view have been aired at a public hearing. Finally, the importance of the opinion differences is emphasized by the fact that the State of Delaware, out of concern for its interests and those of its citizens, has been moved to file an objection and seek a public hearing before the defendants definitively determine to issue the bridge permit.

■ The determination of the defendants to proceed to reinstate the bridge permit and go forward with its construction without a public hearing was in violation of 5 U.S.C. § 706(2)(D), and represented an interpretation of § 115.60(c) of the regulations which was arbitrary and capricious and in derogation of 5 U.S.C. § 706(2)(A).

This conclusion makes it unnecessary to consider other claims of illegality of the defendants' action which the plaintiff has made.

The Court finds that there is a probability that the plaintiff will succeed upon final hearing. Nothing in the record suggests that any particular urgency exists to begin the erection of the bridge before the case can be tried and decided. A delay for that period will work relatively little hardship on the defendants and the members of the public who favor its construction, as against the potentiality of irreparable injury which the plaintiff and objectors will experience if a preliminary injunction is denied. To prevent such potential irreparable injury to plaintiff and public objectors which may result from a denial of the injunction, and in order to maintain the status quo pending a final decision in the case, a preliminary injunction will issue. It will, until further order of the Court, enjoin and restrain defendants, Admiral Chester R. Bender, Commandant, United States Coast Guard and Rear Admiral Ross P. Bullard, Commander, Fifth Coast Guard District, United States Coast Guard, in their official capacities, from recognizing the validity of the permit dated October 20, 1970, as amended on July 9, 1973, and from permitting it to remain in effect, and direct them to take any and all steps needed to prevent the performance of the work authorized by said permit. The injunction will not run against said defendants in their individual capacities since jurisdiction over them individually has not been obtained. The issuance of

mendations of the District Commander concerning bridge permits, and to order that a

public hearing be held on any application submitted."

the preliminary injunction shall be without prejudice to the right of the State of Maryland to move to vacate or modify it, provided that the State of Maryland files a motion for the purpose within 20 days after it has been served with process.

The preliminary injunction is authorized by general principles of equity and by 5 U.S.C. § 705.

The foregoing constitutes the findings of fact and conclusions of law required by F.R.Civ.P. 52(a).