H. Jerome SISSELMAN and Lorraine Sisselman, his wife, and Brancasons, Inc.

v.

Willard SMITH, as Commandant, United States Coast Guard, and the United States Coast Guard.

H. Jerome Sisselman and Lorraine Sisselman, his wife, Appellants in No. 18846,

Brancasons, Inc., Appellant in No. 18847.

H. Jerome SISSELMAN and Brancasons, Inc.

v.

NEW JERSEY TURNPIKE AUTHORITY, Franklin Contracting Company, Willard Smith, as Commandant, United States Coast Guard, and the United States Coast Guard.

H. Jerome Sisselman, Appellant in No. 18848,

Brancasons, Inc., Appellant in No. 18849.

Nos. 18846–18849.

United States Court of Appeals, Third Circuit.

Argued June 25, 1970.

Decided Sept. 22, 1970.

Henry Ramer, Hackensack, N. J. (Walter H. Jones, Hackensack, N. J., on the brief) for appellants.

Henry J. Tyler, Richman, Berry & Ferren, Camden, N. J., Raymond Young, Asst. U. S. Atty., Newark, N. J. (Grover C. Richman, Jr., Camden, N. J., on the brief), for appellees.

Before WINTER,* ALDISERT and GIBBONS, Circuit Judges.

### OPINION OF THE COURT

WINTER, Circuit Judge:

The appeal in these consolidated actions arises from plaintiffs' attempts to prevent the construction of two bridges with fixed vertical clearances of 35 feet across Berry's Creek Canal near its confluence with the Hackensack River in Bergen County, New Jersey. The two bridges are required as part of the expansion of the New Jersey Turnpike authorized by N.J.S.A. 27:23–23.2. The focus of attack is the validity of the permit, issued by the Commandant of the United States Coast Guard on November 21, 1968, which authorized construction of the bridges. It is claimed that the Commandant lacked jurisdiction to issue the permit, that the permit is invalid because the proceedings which resulted in its issuance were not carried on in compliance with the Administrative Procedure Act and that there was not substantial evidence on the record as a whole to support its issuance. The district judge granted summary judgment in favor of the defendants, and we affirm.

I·

The project authorized by the New Jersey Legislature calls for the construction of an expansion spur through the Hackensack Meadows and the construction of two bridges across Berry's Creek Canal. Prior to 1911, the Erie Railroad Company, predecessor to the Erie Lackawanna Railroad, owned and operated a drawbridge over Berry's Creek, a natural waterway flowing into the Hackensack River. When complaints were made that the drawbridge interfered with navigation, Erie, in 1911, sought and obtained congressional approval to construct the canal as a substitute for the drawbridge which was thereafter rebuilt as a fixed low clearance bridge. The approval was embodied in P.L. 61–466, 36 Stat. 1082 (1911) which gave the consent of Congress to the construction of a bridge over navigable water of the United States required by the Rivers and Harbors Appropriation Act of 1899, 33 U.S.C.A. § 401. Section 2 of P.L. 61–466 reserved to Congress the right to alter, amend or

* Circuit Judge of the Court of Appeals for the Fourth Circuit, sitting by designation.

repeal it. The canal was excavated pursuant to the authority obtained.

In 1946, by the enactment of the General Bridge Authority Act of 1946, 33 U.S.C.A. § 525, Congress gave its consent generally to the construction, maintenance and operation of bridges and approaches thereto over the navigable waterways of the United States. This consent was expressly made subject to approval of the location and plans for such bridges and approaches by the Chief of Engineers and the Secretary of the Army who were empowered to impose specific conditions relating to the maintenance and operation of the bridges which they deemed necessary in the interest of public navigation.

In 1964, the plaintiffs Sisselman acquired the canal and proximate lands from the Erie Lackawanna allegedly to develop them into an industrial marina named Port Bergen. Plaintiff, Brancasons, Inc., is the owner of contiguous land fronting on Berry's Creek.

On July 27, 1966, the New Jersey Turnpike Authority applied to the Chief of Engineers for authorization to construct two bridges across Berry's Creek Canal with vertical clearances of 25 feet. By P.L. 89–670, part of the Department of Transportation Act, Congress transferred, effective October 15, 1966, the functions of the Chief of Engineers and Secretary of the Army relative to the issuance of bridge permits to the Department of Transportation. 49 U.S.C.A. § 1655. Thereafter, effective April 1, 1967, the Secretary of Transportation delegated to the Commandant of the United States Coast Guard the authority to exercise the functions, powers and duties relating to the issuance of bridge permits formerly exercised by the Army. 49 C.F.R. § 1.4(a) (3). In order to maintain continuity of service to the public during the transfer of records and establishment of the necessary offices and personnel, the Commandant of the United States Coast Guard executed a memorandum of understanding with the Chief of Engineers. The memorandum provided that the Corps

of Engineers would perform for and under the direction of the Commandant of the United States Coast Guard those services relative to the issuance of permits that it had previously performed until such time as the Coast Guard's facilities and personnel could provide those services to the public.

On January 18, 1968, pursuant to notice theretofore given, a public hearing was conducted by the Corps of Engineers on the Authority's application, with an officer of the Coast Guard present. Plaintiffs participated in the hearing. Statements and testimony of the hearing were not taken under oath, and cross-examination was not permitted, although Colonel R. T. Batson, who presided, stated that he would ask and did ask any questions of witnesses suggested by the interested parties.

On March 26, 1968, the Authority was advised that the Corps of Engineers deemed the vertical clearance and alignment of the bridges as proposed by the Authority inadequate to protect the needs of prospective navigation. The Authority was further advised that a minimum vertical clearance of 35 feet and realignment of the bridges would be required. The Authority submitted a revision of its plans which made no changes in the location of the bridges but increased the vertical clearance to 35 feet and increased the horizontal clearances. Plaintiffs were informed of the receipt of the revised application and afforded the opportunity to submit additional material for consideration. They availed themselves of this opportunity.

On November 21, 1968, the Commandant of the Coast Guard issued Bridge Permit 238–68 authorizing the construction of the bridges in accord with the application as amended. This litigation ensued.

Contemporaneously with the proceedings culminating in issuance of the bridge permit, the Authority instituted condemnation proceedings to acquire from plaintiffs and others two parcels of land to build the spurs leading to the

bridges. See New Jersey Turnpike Authority v. Sisselman, 106 N.J.Super. 358, 255 A.2d 810 (1969).

Additional facts will be stated in connection with the contentions to which they relate.

## II

Plaintiffs argue that the effect of the P.L. 61–466 of 1911 was to maintain the navigability of Berry's Creek unimpaired and that since the authority to amend that law was reserved solely to Congress, it follows that the Coast Guard was without jurisdiction to grant the bridge permit. This is so, the argument runs, because the navigability of Berry's Creek would be substantially impaired by the construction of the authorized bridges over the canal whose function was to protect the navigability of Berry's Creek upstream of the fixed bridge built by Erie. While we agree as to the purpose of the 1911 statute, it does not follow that the bridge permit was unauthorized.

Article 1, Section 8 of the U. S. Constitution empowers Congress "[t]o regulate Commerce * * * among the several States." Implicit in this grant is the power to regulate navigation and navigable waters, Gibbons v. Ogden, 9 Wheat. 1, 22 U.S. 1, 6 L.Ed. 23 (1824), and included in this latter grant is the power to regulate bridge construction. Gilman v. Philadelphia, 3 Wall. 713, 70 U.S. 713, 18 L.Ed. 96 (1866). In 1899, Congress asserted the full extent of its authority in this area by requiring the consent of Congress in advance of building any bridge over a navigable waterway. 33 U.S.C.A. § 401 (Rivers and Harbors Appropriation Act). The General Bridge Authority Act of 1946 (33 U.S.C.A. § 525) granted the consent of Congress for the construction of bridges over navigable waters after approval by the Chief of Engineers and the Secretary of the Army as well as by the relevant local authorities. The authority of the Chief of Engineers and the Secretary of the Army has now been delegated to the Commandant of the Coast Guard and the Secretary of Transportation, and they have exercised it by granting the bridge permit in the instant cases.

Plaintiffs' argument that the 1911 statute excepts bridges over Berry Creek Canal from that course of approval proceeds on the theory that since Congress reserved the power to alter, amend or repeal the act of 1911, the General Bridge Authority Act of 1946 should not be read to derogate from Congress' explicit retention of control in the 1911 statute. In support of their position they cite the general principle against implied repealer of specific statutes by general statutes.

■ That principle of statutory construction is inapplicable in the present case. The General Bridge Authority Act was clearly intended to end piecemeal Congressional supervision of bridge construction by delegation of Congressional authority to an expert administrative agency. In view of this blanket delegation, it is anomalous to suppose that Congress intended to retain supervisory duties over numerous and unrelated bridges which happened to be the subject of prior legislation. Rather, Congress intended that its entire authority—that reserved and that unexercised—be delegated to the agency. Support for this conclusion is found in cases which construed similar provisions of the Federal Power Act and which held that congressional authority specifically reserved by prior piecemeal legislation was transferred by a general statutory delegation to the Federal Power Commission. Northwest Paper Company v. Federal Power Commission, 344 F.2d 47 (8 Cir. 1965); Minnesota Power & Light Company v. Federal Power Commission, 344 F.2d 53 (8 Cir. 1965). Stated succinctly, " '[i]t is unreasonable to assume * * * that Congress was delegating to a specialized expert body the obligation of securing comprehensive development of the nation's power resources, while reserving to itself the responsibility of continued surveillance over all locations where any developments had been constructed under previously granted

permits.'" Northwest Paper Company v. Federal Power Commission, 344 F.2d at 52. We deem the same holdings applicable here and conclude that the power reserved in the 1911 statute was delegated to the Commandant of the Coast Guard so as to give him jurisdiction to issue the bridge permit in question.

### III

Plaintiffs next assert that the proceedings leading to issuance of the permit failed to comply with the Administrative Procedure Act (APA). Specifically, they cite Colonel Batson's failure to permit traditional cross-examination at the hearing and the absence of notice to plaintiff Brancasons, Inc. of the Authority's revised application in which it abandoned its request for vertical clearance of only 25 feet.

█ Section 7 of APA, 5 U.S.C.A. § 556(d), grants the right of cross-examination, and § 5, 5 U.S.C.A. § 554 (b), requires notice of hearing, but both of these provisions are operative only to "every case of adjudication *required by statute to be determined on the record after opportunity for an agency hearing*" (emphasis supplied) with exceptions not pertinent here. 5 U.S.C.A. § 554(a). It follows that in its adjudicatory provisions APA has no application unless some other statute directs an agency hearing. Webster Groves Trust Company v. Saxon, 370 F.2d 381 (8 Cir. 1966); LaRue v. Udall, 116 U.S.App. D.C. 396, 324 F.2d 428 (D.C. Cir. 1963); cert. den., 376 U.S. 907, 84 S.Ct. 660, 11 L.Ed.2d 606 (1964); A. L. Root Transportation, Inc. v. United States, 280 F. Supp. 152 (D.Vt.1968). Additionally, § 7(b), 5 U.S.C.A. § 556(b), provides that "[t]his subchapter ["Administrative Procedure"] does not supersede the conduct of specified classes of proceedings, in whole or in part, by or before boards or other employees specially provided for by or designated under statute." This, too, supports the conclusion that APA does not impose any requirement of an adversary hearing

before an agency, but only specifies the procedure to be followed when a hearing is required by some other statute.

The Rivers and Harbors Appropriation Act of 1899, the General Bridge Authority Act of 1946 and P.L. 61–466 may be searched in vain for any language indicating the need for an adversary hearing before the authority contained therein may be exercised. Plaintiffs rely on 49 U.S.C.A. § 1655(h), a portion of the statute creating the Department of Transportation, but we do not think that it has the effect of making the adjudicatory provisions of APA applicable. That section states that subchapter II of chapter 5 and chapter 7 of APA "shall be applicable to proceedings by the Department and any of the administrations or boards within the Department," but again the adjudicatory provisions of APA are applicable only when expressly made applicable by some statute requiring an adversary hearing. Section 1655(h) contains no such express provision.

█ We, therefore, conclude that plaintiffs had no right of cross-examination, nor did they have a right to notice, in the proceedings leading to issuance of the bridge permits. It follows that any irregularities in these regards would not invalidate the permits. In concluding that the adjudicatory provisions of APA were not applicable to the proceedings, we note that no similar contention is advanced with regard to the judicial review provisions. Citizens Committee for the Hudson Valley v. Volpe, 425 F.2d 97 (2 Cir., April 16, 1970).

### IV

Section 10(e) of APA prescribes the scope of judicial review as a determination, *inter alia,* of whether the agency's actions, findings and conclusions are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or, where the agency is required to proceed with the adjudicatory provisions of APA, whether they are "unsupported by substantial evi-

dence." Plaintiffs argue that the Commandant's decision is deficient under both tests. We need not delineate which is the appropriate test because we think that the evidence supports him under either.

Unquestionably, the application for the bridge permits was vigorously opposed, and there was evidence to show that theoretical navigation of the Hackensack River upstream from the contemplated bridges would be impaired. But there was substantial evidence to show that this navigation was more theoretical than real and that no existing or foreseeable future maritime development would be impaired.

In pertinent part, the Commandant's general conclusions, summarizing his detailed, specific findings of fact, were:

The construction of a port for ocean going vessels as proposed [plaintiffs' proposed Port Bergen] appears to be an unrealistic projection. Approximately 4.5 miles of the Hackensack River would require dredging to a depth of 25 or more feet from the existing 12-foot channel, and two railroad bridges would require replacement to afford vessels adequate horizontal clearance. These facts tend to preclude the development of a port for ocean going vessels in the location envisioned by developers.

Berry Creek Canal is a tributary of the Hackensack River, an important commercial waterway in the State of New Jersey. The Hackensack River empties into Newark Bay, Kill Van Kull, New York Bay and Atlantic Ocean. Ocean going vessels navigate the Hackensack River to a turning basin located at mile 4. Beyond the turning basin, the majority of river traffic is limited to barge and tug traffic. While there is no commercial traffic along the Berry Creek Canal at the present time, the Canal may at some future date service terminals along its banks. The land adjacent to the Canal is mostly marshland and is theoretically developable for a variety of commerical purposes. The types of facilities which could be erected on this type of land are numerous; therefore, it is not possible at this time to predict the actual maritime requirements for the proposed bridges, since non-marine development is a possibility.

■ Coupled with these conclusions as to potential future use was the legislative determination that the public interest and use required an extension of the turnpike and the judicial determination that the taking was for the public good and that the locating of the extension was not arbitrary, oppressive or in bad faith. New Jersey Turnpike Authority v. Sisselman, *supra.* As found by the Commandant, judicial approval of the location of the roadway "will permit the New Jersey Turnpike Authority to construct a section of the Turnpike parallel to the Hackensack River thus eliminating that parcel of land fronting on the Hackensack River for port purposes." Thus, we find neither arbitrariness, capriciousness, abuse of discretion, or lack of substantial evidence.

Because of our views concerning the merits of the controversy, we do not consider the defense of sovereign immunity advanced by the Coast Guard. The judgment of the district court will be affirmed.