The **STATE OF DELAWARE** on her behalf and on behalf of her residents, Plaintiff,

v.

Admiral **Chester R. BENDER,** Commandant, **United States Coast Guard,** et al., **Defendants.**

**Civ. A. No. 4767.**

United States District Court, D. Delaware.

Oct. 29, 1975.

Johanna D. Drooz Yoffie, Deputy Atty. Gen., Wilmington, Del., for plaintiff.

W. Laird Stabler, U. S. Atty., Wilmington, Del., for federal defendants.

William M. Huddles, Asst. Atty. Gen., Baltimore, Md., for defendant, State of Maryland.

## OPINION

EDWIN D. STEEL, Jr., Senior District Judge:

Plaintiff, the State of Delaware, on its own behalf and on behalf of its residents has filed a "Supplemental Pleading" against the defendants, Admiral Chester R. Bender, Commandant, United States Coast Guard ("Commandant"), Rear Admiral Ross P. Bullard, Commander, Fifth Coast Guard District, United States Coast Guard ("District Commander"), and the State of Maryland. Plaintiff seeks a judicial review under the Administrative Procedure Act, 5 U.S.C. § 701, *et seq.* of action taken by the Coast Guard in reinstating a permit for the construction of a fixed span bridge have a 40′ vertical clearance at mean high water mark over the Nanticoke River, a navigable waterway. The proposed bridge is to be located approximately 500′ upstream from an existing drawbridge just east of Sharptown, Maryland. Sharptown lies 9.6 miles by boat downstream from Seaford, Delaware. The latter, like Sharptown, is serviced by vessels utilizing the Nanti-

coke. Plaintiff asserts that the bridge, when constructed, will be of insufficient height to satisfy the reasonable needs of navigation and asks the Court to declare that the permit is invalid and to issue an injunction against the permit being continued in effect. Basically, the question for review is whether the Coast Guard's finding that the proposed bridge with a 40′ limiting vertical clearance will meet the reasonable needs of present and prospective navigation was arbitrary, capricious or an abuse of discretion.[1]

To properly understand the present posture of the case, a recital of the events leading up to it is necessary.

Background Prior to Decision in *State of Delaware v. Bender,* 370 F.Supp. 1193 (D.Del.1974)

The Coast Guard is authorized to act on bridge permit applications. The source of its power to do so is detailed in *State of Delaware v. Admiral Chester R. Bender,* 370 F.Supp. 1193, 1195–96 (D.Del.1974).

On January 20, 1969, the State Roads Commission of Maryland, in accordance with procedures prescribed in 33 C.F.R. § 115.60, filed an application with the Commander of the Fifth United States Coast Guard District for the approval of the bridge at Sharptown. The proposed project was given public notice and objections to it were made by the State of Delaware, the City of Seaford and numerous other companies and individuals who primarily resided or carried on business in lower Delaware in the area of Seaford. Although some objectors requested a public hearing, none was held. For the most part the objections were based upon the claim that a fixed span bridge with a vertical clearance

limited to 40′ would not provide sufficient clearance for existing and potential use of the Nanticoke by commercial vessels and pleasure craft. Because of this it was asserted that the bridge would be detrimental to the economic well-being of the residents of lower Delaware and be of disadvantage to Seaford, particularly in relationship to nearby ports, such as Salisbury, Maryland.

On October 21, 1969, the District Commander filed a Report with the Commandant recommending approval of the application for a bridge having a 40′ vertical clearance, and on October 20, 1970, Bridge Permit 179–69 was issued under the authority of the Commandant. The permit by its terms was to be null and void unless actual construction of the bridge was begun within two years. This was not done. On December 5, 1972, the Maryland Department of Transportation submitted an application to have the original permit reinstated. Public notice of this application was given, objections were again filed, a public hearing was again requested, but none was held.

On May 30, 1973, the District Commander filed a Report with the Commandant in which he recommended that Bridge Permit 179–69 be reinstated with time for commencement and completion of construction limited to three and five years respectively. On July 9, 1973, the permit issued October 20, 1970 was reinstated.

These events prompted plaintiff to file the present action on January 21, 1974 against the Commandant and District Commander of the Coast Guard. The State of Maryland was later added as a defendant. The complaint alleged the invalidity of Bridge Permit 179–69,

---

1. The General Bridge Act of 1946, 33 U.S.C. § 525(a), mandates that plans for bridges over navigable waters be approved by the Chief of Engineers and Secretary of the Army. It provides that they can impose specific conditions relating to the maintenance and operation of the structure which they deem necessary "in the interest of public navigation, and the conditions so imposed

shall have the force of law." The authority thus granted to the Army was later transferred to the United States Coast Guard. *Sisselman v. Smith,* 432 F.2d 750, 752 (3rd Cir. 1970). In acting upon an application for a bridge permit the Coast Guard is required to state the "probable effect on navigation, present and prospective, with reasons". 33 C.F.R. § 115.60(d)(1).

as reinstated, prayed for a declaratory judgment adjudging the permit to be invalid and for an injunction against the defendants continuing the permit in effect.

On January 28, 1974, this Court rendered an opinion in *State of Delaware v. Bender,* 370 F.Supp. 1193 (D.Del.1974) holding that the action of the defendants in reinstating the bridge permit without a public hearing was invalid. Accordingly, it enjoined the defendants from recognizing the permit and from permitting it to remain in effect.[2] On May 10, 1974, this Court further ordered that a public hearing be held, with notice to interested parties, prior to further action by the District Commander and the Commandant on Maryland's application to reinstate the permit.

Events Between Decision in *State of Delaware v. Bender,* 370 F.Supp. 1193 (D.Del.1974) and the "Supplemental Pleading"

On July 24, 1974, following public notice, a public hearing was held on the bridge application at the Wicomoco County Courthouse in Salisbury, Maryland, in accordance with 33 C.F.R. § 115.60(c). The hearing was attended by approximately 115 people, 23 of whom spoke for the record.

On September 6, 1974, the District Commander filed a Report addressed to the Commandant recommending that the reinstatement of Bridge Permit 179–69 be denied, and that no bridge be considered with a navigational vertical clearance of less than 50′.[3] He explained his reversal of his previous recommendation approving a bridge with a 40′ vertical clearance by stating that subsequent to the initial issuance of the permit substantial changes had occurred in conditions affecting transportation on the Delmarva Peninsula. These changes, he stated, included increased water transportation, increases in size of tugs and

barges, increases in vehicle traffic, deterioration of rail service, increases in recreational boating and changing economic conditions.

The most critical question involved in determining whether the bridge application should be granted was its probable effect on navigation, present and prospective. 33 C.F.R. § 115.60(d)(1). As to this the District Commander said that only if a bridge had the clearance which he deemed necessary would it meet the reasonable needs of current and prospective navigation.

The District Commander then sent the file to the Bridge Division of the Office of Marine Environment and Systems in accordance with 33 C.F.R. § 115.60(e) for the purpose of having it subjected to "analysis and review" prior to "final action" by the Commandant. Thereafter, on January 7, 1975, the Commandant rendered his Opinion. In it he stated that arguments of the parties in opposition to the 40′ vertical clearance were not factually supported nor was there a sufficient basis for the findings, conclusion and recommendations of the District Commander concerning future navigation. The Commandant concluded that the project as proposed would meet the reasonable needs of navigation, present and future, and issued an order which recognized as valid Bridge Permit 179–69, as reinstated.

*Present Posture of the Case*

On February 20, 1975, plaintiff filed a "Supplemental Pleading" which alleged the events above referred to which had transpired following this Court's opinion of February 28, 1974. By the Supplemental Pleading plaintiff sought a judicial review of the Commandant's action of January 7, 1975, in reinstating Bridge Permit 179–69. On February 20, 1975, it was stipulated by the parties and ordered by the Court that the effec-

---

2. The decision was rendered on plaintiff's oral motion for a preliminary injunction. The parties agreed that it should constitute a final judgment.

3. He also recommended that the horizontal clearance be not less than 100′. This is not material to the present review.

tive date of the permit be postponed pending a final review of its validity.

 In *Sisselman v. Smith,* 432 F. 2d 750 (3rd Cir. 1970), federal jurisdiction to review a Coast Guard determination to issue a bridge permit over navigable waters was assumed to exist without discussion or identification of its source.[4] The authority of the Coast Guard to issue bridge permits derives from the General Bridge Act of 1946. The Court's jurisdiction is clear under 28 U.S.C. § 1337.[5] Furthermore, plaintiff has standing to obtain a review of the Coast Guard's action under the APA since the action of the Commandant in reinstating the permit was final agency action for which there was no other adequate remedy in a court and plaintiff claims to have been adversely affected or aggrieved by the action. See 5 U.S. C. §§ 702, 704. The Supplemental Pleading is now before the Court on cross motions for summary judgment.[6]

### Standard of Review

 Initially to be determined is the scope of review of the agency action. It is not contended that there is any statutory prohibition of the review nor that the approval of bridge permits falls within the narrow exception of "agency action is committed to agency discretion by law". 5 U.S.C. § 701(a). *See Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 410–413, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). Thus review must

proceed under one or more of the six standards listed in 5 U.S.C. § 706(2) (A)–(F). Three of these, §§ 706(2) (A), (E) and (F), provide alternative standards for review of the findings of an administrative agency. The instant case involves review of agency action taken after an informal public hearing. No adversary hearing is required when the Coast Guard considers an application for a bridge construction permit. *Sisselman v. Smith, supra.* Because this is not an adjudicatory proceeding, neither the "substantial evidence" test of § 706(2)(E) nor *de novo* review under § 706(2)(F) is warranted. *Overton Park, supra,* at 414–5, 91 S.Ct. 814, 822. The proper standard of review is therefore that of § 706(2)(A) which requires that agency action be set aside only if it is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law."[7] As explained in *Overton Park, supra,* at 416, 91 S.Ct. at 823, review under this standard is of quite limited scope:

> "To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. [Citations omitted.] Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency."

---

4. While there is a division of circuits on the question of whether the APA is a jurisdiction conferring statute, *Ortego v. Weinberger,* 516 F.2d 1005 (5th Cir., 1975), the position of the Third Circuit is that jurisdiction cannot be founded upon the APA but must have an independent origin. *Bachowski v. Brennan,* 502 F.2d 79, 82 (3rd Cir. 1974), *rev'd on other grounds,* 421 U.S. 560, 95 S.Ct. 1851, 44 L.Ed.2d 377 (1975).

5. 28 U.S.C. § 1337 reads:
 "The district courts shall have original jurisdiction of any civil action or proceeding arising under any Act of Congress regulating commerce . . . ."
 The General Bridge Act of 1946 is such an Act. *See Bachowski v. Brennan, supra.*

6. The parties have stipulated that plaintiff intended that its Supplemental Pleading should be a motion for summary judgment. The cross motion has been filed by the federal defendants. No motion was filed by the State of Maryland.

7. In *Sisselman v. Smith, supra,* the Third Circuit found it unnecessary to decide whether review would be under the "substantial evidence" or "arbitrary and capricious" standard. *Overton Park, supra,* decided subsequent to Sisselman, makes it clear that only the latter standard is appropriate.

A reviewing court should not interfere with an administrative judgment merely because grounds exist for a different opinion, even though the Court might have reached a different conclusion. *Securities and Exchange Commission v. Chenery Corp.*, 318 U.S. 80, 94, 63 S.Ct. 454, 87 L.Ed. 626 (1943). When administrative action is challenged a presumption exists in favor of its validity. *Thompson v. Consolidated Gas Co.*, 300 U.S. 55, 59, 57 S.Ct. 364, 81 L.Ed. 510 (1937). Despite this presumption, review of the Commandant's Opinion compels the conclusion that he committed a clear error of judgment in failing to take account of certain critical factors; hence the reinstatement of the bridge permit must be set aside and the case remanded.[8]

### The Merits

■ The Report of the Commandant reveals that his basic difference with the District Commander was because, as he said, the District Commander had taken too short-sighted a view of the future navigational needs of the Nanticoke.[9] The Commandant recognized that the District Commander might reasonably have concluded upon the information before him, that "no short term improvements are likely to be undertaken on the waterway that will precipitate an increase in the size of vessels that will use the waterway in the future."[10] The Commandant found this to be an insufficient approach and said, "[a]ttempts should have been made by the district to develop facts and forecast changes and trends that would be reasonably expected on the waterway over a

longer period, a period more compatible with the life expectancy of the proposed bridge." According to the District Commander, the life expectancy of the bridge was fifty years.

Having properly professed that any judgment as to the vertical height which the bridge should have necessitated a look well into the future, the Commandant then fell into the same error that he charged the District Commander with and based his conclusion on data relating to channel conditions only in the near or immediate future. While no prediction concerning the navigational conditions of the Nanticoke over a fifty year period or even a substantially shorter one could possibly have been made with even a modicum of precision, the Commandant was right in concluding that a long-range projection of such conditions should have been attempted and indeed was necessary to make a meaningful judgment as to the adequacy of a 40′ bridge.

The Commandant concluded that ". . . it is more the waterway channel characteristics than a limiting vertical clearance of 40 feet that will impede the use of larger vessels on the Nanticoke in the foreseeable future." The Commandant's Opinion reveals that the "waterway channel characteristics" he had in mind were the shoaling and shallow spots which existed at Wetipquin Creek, Quantico Creek and Hawk's Nest Shoal. He found that these shoals and shallows were determinative of the length, width and draft characteristics of the vessels and tows employed by operators engaged in waterborne commerce activities on the Nanticoke, and that

---

8. Because the case is decided on this ground, the Court need not consider plaintiff's alternative allegations of procedural and constitutional infirmities, reviewable under § 706(2)(B) and (D), respectively.

9. "Future navigational needs" are critical to any determination of the adequacy of bridge clearance. See General Bridge Act of 1946, 33 U.S.C. § 525(b); 33 C.F.R. § 114.10(a); 33 C.F.R. § 115.60(d)(1).

10. Despite this, and the then authorized depth of the Nanticoke of 12′, the District Commander found that a bridge with a 50′ clearance was needed because:

"Based on available statistics and professional experience it appears that the tug design of the future is fairly well set and tugs heights will run from 36′ to 45′ with a draft of under 12′."

their maneuvering space was controlled by the shoals and shallows. The Commandant noted that Allied Towing Company could not operate its vessels with mast heights in excess of 38′ because of the limited depths of the channel, and that the oil barge operators could not load to full draft because of the limited depth and shoaling in the river. They presently load, said the Commandant, at an approximate 20% reduced capacity to avoid damage to their equipment. The Commandant concluded: "There is a direct correlation between the length, draft, height and horsepower of self-propelled vessels. Because of the above-described conditions, larger vessels with greater drafts and corresponding increased mast heights are not likely to use the waterway in the foreseeable future."

Because of the importance of the navigational conditions of the Nanticoke, the Commandant said:

"We have further explored the future status of the federal project for improvement of the Nanticoke River with the Baltimore District Corps of Engineers and the Office of the Chief of Engineers here in Washington. We find that over the longer term no further work on the waterway has been authorized nor is it likely that any channel deepening project or maintenance work will be performed in the foreseeable future."

The information which the Baltimore District and the Washington Office of the Corps of Engineers supplied to the Commandant is not made a part of the record before the Court. However, the file which the Commandant received from the District Commander had in it a letter from the Baltimore Corps of Engineers dated July 24, 1974, which stated only that the Corps did not contemplate accomplishing any maintenance work "at this time or in the near future."[11]

Furthermore, defendant filed with the Court an affidavit from the author of this letter, John P. O'Hagan, Chief of the Operations Division, Baltimore District, Corps of Engineers, which included information that was available to the Commandant.[12] The O'Hagan affidavit reveals the following facts:

The congressionally authorized depth of the Nanticoke is 12′ from the month of the river to Seaford, Delaware. However, in 1972 the "controlling depth" at the shallowest part of the authorized main channel was 7′. (O'Hagan aff. ¶ 2). This was undoubtedly due to the shoals alluded to by the

---

11. See Doc. 33A, Ex. C, Attachment VI. When the inquiry which elicited this statement is read with the letter it is apparent that the Corps was referring to maintenance dredging to eliminate the shoals as well as dredging to deepen the channel.

12. Doc. 47. Much of the information contained in the affidavit was summarized in the second full paragraph on page 2 of the Commandant's Opinion. The Court recognizes that the affidavit is dated June 3, 1975, nearly six months after the Commandant's decision, and thus may contain information which was not then available to the Commandant. In general documents which were not in existence when agency action was taken are irrelevant and may not be utilized by the Court. The review of administrative action must be "based on the full administrative record that was before the Secretary at the time he made his decision."

*Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 421, 91 S.Ct. 814, 825, 28 L. Ed.2d 136 (1971). In determining whether an administrative officer abused his discretion by his action "the focal point for judicial review should be the administrative record already in existence, and not some new record made initially in the reviewing court." *Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1972). Both of the cited cases recognize an exception which permits judicial consideration of supplemental material submitted when the "Court decides that additional explanation is necessary", 401 U.S. at 420–421, 91 S.Ct. at 826. Although the Court did not request the O'Hagan affidavit it may be properly considered inasmuch as it is a statement by one of the sources of the Commandant's information and sets forth in more detail facts alluded to in his Opinion.

Commandant, which he found would not be remedied "in the foreseeable future".

The accumulation of sediment along a river bed necessitates periodic channel maintenance. (O'Hagan aff. ¶ 3). This is a matter of common knowledge if a river channel is to be kept open. The maintenance of the Nanticoke channel is normally accomplished by private dredge under contract with the Corps of Engineers. (O'Hagan aff. ¶ 4). The river was first dredged to its present authorized depth of 12′ in 1956–7. (O'Hagan aff. ¶ 5). The first maintenance thereafter occurred in 1965 when a dredging operation was conducted at Hawk's Nest Shoals. (O'Hagan aff. ¶ 6). The need for such work was again recognized in 1972 when $97,000 was made available for the purpose. However, the funds then available were diverted elsewhere when Sussex County, Delaware failed to cooperate with the Corps of Engineers in the performance of the contemplated work. (O'Hagan aff. ¶ 7).

In view of the fact that maintenance dredging had been accomplished in 1965 and was authorized again in 1972, it would seem to be a foregone conclusion that maintenance dredging would occur periodically during the expected lifetime of the bridge. For the Commandant to conclude that no maintenance work was contemplated "in the near future" or would be performed "in the foreseeable future" was to ignore the probability, if not the virtual certainty, that the work would be done well within the early years of the next decade of the fifty year life span of the bridge. His conclusion constituted a clear error of judgment which was arrived at by ignoring relevant facts which were readily available to him.

 Furthermore, the O'Hagan affidavit also indicates that although Sussex County originally refused to cooperate in the maintenance dredging, it has now agreed to do so, the sum of $25,000 is presently available to be applied toward it, and the Corps of Engineers survey team is now in the field to determine the location of shallow areas most in need of maintenance.[13] (O'Hagan aff. ¶¶ 8, 10). It is impossible to determine whether this information was available to the Commandant since the affidavit post-dates the Commandant's Report. Even if it were not, a reviewing court may consider circumstances arising subsequent to agency action which render it inappropriate to uphold that action. See *N.L.R.B. v. Jones & Laughlin Steel Corp.*, 331 U.S. 416, 428, 67 S.Ct. 1274, 91 L.Ed. 1575 (1947); *N.L.R.B. v. Culinary Alliance and Hotel Service Employees Union Local 402*, 436 F.2d 1378 (9th Cir. 1971); *General Engineering, Inc. v. N.L.R.B.*, 311 F.2d 570 (9th Cir. 1962).

Although the Report of the Commandant discloses that he was more concerned about the limiting effect of shoaling than about the effect of the 12′ channel on navigation by larger vessels on the Nanticoke, information which he had from the Corps of Engineers concerning both maintenance dredging and channel deepening stated that no work was contemplated "in the near future". However, to the extent that the Opinion of the Commandant was influenced by the fact that the authorized channel was limited to 12′, he should have given long range consideration to the possibility that the channel would be deepened in the future.

The need for the Commandant examining all reasonable possibilities of the Nanticoke being deepened beyond 12′ sometime in the future is emphasized by

13. However, no actual dredging will be accomplished in connection with the present survey until additional funds are made available. Without taking into account the cost of the actual dredging, or the cost of any environmental impact study which may be required, the cost of mobilization alone—that is, bringing a dredge to the site, constructing a dyke disposal area and constructing a pipe line at the disposal area—would today cost $25,000, even if dredging were to be confined to an area the size of the Hawk's Nest Shoals project of 1965. (O'Hagan aff. ¶ 11).

the affidavit of Rear Admiral Price.[14] In paragraph 4 he lists data which he states in paragraph 5 he consulted to determine to what extent, if any, a 40' high bridge might limit traffic above the bridge "taking into consideration the depth of the river which is 12' or less." The validity of this approach, based as it is on the assumption that the depth of the Nanticoke will never be greater than 12' during the next fifthy years or a substantial part thereof, presents a matter of relevant concern to which the Commandant should have addressed himself. In view of the length of time which peering into the future involves and the impossibility of arriving at a firm predictable forecast, a reasonable amount of conjecture by the Commandant was required in the interest of contingency planning. The view of the District Commander that "proper contingency planning dictates that consideration must be given to at least the next fifty years" was reasonable. The need for such planning was especially acute since the additional cost of building a bridge with clearance unnecessarily high was inconsequential as compared with the potentiality of perpetual and incalculable damage to Delaware and its citizens which would result from constructing a bridge having an insufficient clearance.[15]

It is far from a foregone conclusion that the Nanticoke will not be deepened sometime in the distant future if not sooner. In 1961 the Congress authorized a study of the feasibility of deepening it to 24'. The study was never funded and so far as the Corps of Engineers knows there is no authorization anticipated to deepen the channel "in the foreseeable future".[16] The conclusion of the Commandant that no channel deepening will occur in the "foreseeable future", while consistent with the letter dated July 24, 1974 from the Corps of Engineers stating that no such work was contemplated "at this time nor in the near future", can scarcely justify a judgment as to what is likely to occur at some remote point in time during the next fifty years.

Congressman duPont, however, has expressed the intention to request a funding of the feasibility study to be included in the fiscal 1977 budget.[17] No one with human foresight can anticipate what the fate of this request will be. In arriving at any decision the authorizing and funding authorities, it is believed, could reasonably be expected to rely heavily upon the uncontroverted facts set forth in the District Commander's Report, ¶¶ 8, 9b, and 10a, b, c, e, h, j, k and l. Furthermore, the analysis by Rear Admiral Price of the figures shown in the 1973 edition of Transportation Lines on the Atlantic, Gulf and Pacific Coasts discloses that of the type of vessels which he considered relevant to operate on the Nanticoke, 30% of those built or rebuilt prior to 1968 required a draft of over 12', whereas of

---

14. He is the Chief of the Office of Marine Environment and Systems of the Coast Guard. As such he supervised the review of the bridge permit application and the recommendation of the District Commander. By delegation from the Commandant he supervised the preparation and signed on his behalf the Opinion dated January 7, 1975, setting forth the reasons for the reinstatement of the original permit. (Price aff. ¶¶ 1, 2). Although this affidavit post-dates the Commandant's decision, it may properly be considered as supplemental explanation. See footnote 12, page 1072, *supra*.

15. Based upon most recent estimates the cost of constructing a 40' bridge would be $3,640,480, whereas a bridge with a 50' clearance would presently cost $4,889,984 (pp. 11 and 12, Brief of State of Maryland filed June 2, 1975, Doc. 44). The difference of $1,249,504, while large, amortized over a fifty year period would be only about $25,000 per year. A 45' bridge would cost only $4,025,000, which is only $384,520 more than the cost of a 40' bridge. If the difference is amortized over a period of fifty years the annual cost would be a mere $7,800.

16. (O'Hagan aff. ¶ 11)

17. (duPont aff. ¶ 11). This was not before the Commandant when he filed his report. However, it is relevant for this Court's consideration. See page 1073, *supra*.

the vessels built or rebuilt after 1968, 57% required a draft of over 12'.[18] This trend, if sustained by further studies, is a factor which could bear heavily upon any forecast of whether the Nanticoke channel will be deepened beyond its present 12' depth.

### Conclusion

The failure of the Commandant to consider factors which were relevant to his decision led him into making a clear error of judgment, and rendered the decision "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law". *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1970)

Since a remand will be ordered, it is suggested that the Commandant give further consideration to the District Commander's finding that "based on available statistics and professional experience it appears that the tug design of the future is fairly well set and tugs heights will run from 36' to 45' with a draft of under 12'." The District Commander stated that he found support for this conclusion by comparing the 1969 with the 1973 editions of Transportation Lines. If the District Commander's conclusion was right, then a bridge with a clearance of in excess of 40' might be required even if no channel deepening could be foreseen over a substantial part of the next fifty years.

The Commandant came to a different conclusion than the District Commander as to the future heights of vessels which might be expected to operate on the Nanticoke. He said that a study of the 1973 edition of Transportation Lines showed a trend that "future vessels constructed for operation in areas with waterway characteristics similar to the Nanticoke River will generally have drafts less than 12' and mast heights less than 40'." [19] The sampling which underlay the Commandant's trend finding as to the heights of vessels requiring depths of less than 12' may have been too limited to make the Commandant's judgment as to the trend valid and on remand this matter also should be given further consideration.

The case should be remanded so that the Commandant may reconsider his decision in the light of this opinion and if he so desires refer all or any portion of

18. The figures purportedly shown in the 1973 edition of Transportation Lines are analyzed in paragraphs 8 and 9 of Rear Admiral Price's affidavit and corrected at page 26 of Federal Defendant's Reply Brief, Doc. 54. They disclose the following:

| | |
|---|---|
| Total ships shown in his computations | 543 |
| Ships built or rebuilt in 1968 or later | 72 |
| Ships built or rebuilt before 1968 | 471 |
| Total number of vessels requiring draft of more than 12' | 181 |
| Number of vessels built or rebuilt since 1968 requiring draft of more than 12' | 41 |
| Vessels built or rebuilt before 1968 requiring draft of more than 12' | 140 |
| Percentage of vessels built or rebuilt prior to 1968 requiring draft of over 12' | 30% |
| (This is arrived at by dividing 140 by 471) | |
| Percentage of vessels built or rebuilt after 1968 requiring draft of over 12' | 57% |
| (This is arrived at by dividing 41 by 72) | |

19. This study was based simply on the 1973 edition of Transportation Lines whereas the District Commander's conclusion was based upon a comparison of the 1969 and 1973 editions.

the case to the District Commander for further consideration. In view of the informal nature of the proceeding contemplated by the regulations, neither plaintiff nor any other interested party need be given notice or afforded a further opportunity to be heard in connection with it.

The motion for summary judgment of the federal defendants to dismiss the Supplemental Pleading is denied and the motion of plaintiff for summary judgment is granted to the extent herein indicated.